## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| AARON HAGELE, ANDREW | ) | |
| SARCINELLA, JR., and AASH | ) | |
| SERVICES, LLC | ) | |
| | ) | 4:21-cv-04103 |
| Plaintiffs, | ) | |
| | ) | Chief Judge Lee Rosenthal |
| v. | ) | |
| | ) | |
| SHELL OIL COMPANY, PMI | ) | |
| SERVICES NORTH AMERICA | ) | |
| INC., and DEER PARK REFINING | ) | |
| LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' APPLICATION

## FOR A TEMPORARY RESTRAINING ORDER

Christopher V. Langone
Mark T. Lavery
Langone Law LLC
2275 Half Day Road, Suite 346
Bannockburn, IL 60015
312-720-9191

James P. Batson, Esq. (pro hac vice pending)
520 White Plains Rd. Suite 500
Tarrytown, NY 10591
914-523-2278

Attorneys for Plaintiffs

1

## *TABLE OF CONTENTS*

I. INTRODUCTION.................................................................................................... 3

II. FACTUAL BACKGROUND ............................................................................... 4

III. LEGAL STANDARD ......................................................................................... 8

IV. PLAINTIFFS ARE ENTITLED TO A TRO TO PRESERVE THE STATUS          10
QUO.........................................................................................................................

A. Plaintiffs Are Likely to Prevail on Merits ...................................................... 10

1. Acquisitions that are Output Reduction Agreements Are Prohibited – 11

2. Market Allocation Lessens Competition and is Prohibited under Clayton
Act - 14

3. Defendants' Pending Acquisition Violates the Plain Language of Section 7 –
15

B. Plaintiffs Will Suffer Irreparable Harm if the Deal Closes………................      16

C. The Equities Tip Decidedly in Favor of a TRO………………………………      18

D. Granting A Preliminary Injunction is in the Public Interest…………………      20

V. NO BOND SHOULD BE REQUIRED...................................................................      21

VI. CONCLUSION...................................................................................................      22

VII. TABLE OF AUTHORITIES ...........................................................................      25

## I.    INTRODUCTION

Plaintiffs request that the Court enter a temporary restraining order ("TRO") to temporarily enjoin, pending further proceedings, Defendants from closing on an imminent acquisition next month that will permanently raise gasoline prices in the U.S. and which will cause unique irreparable harm to Plaintiffs. Defendants Shell Oil Company ("Shell") and PMI Services North America Inc. ("PMI") are planning on closing on an anticompetitive deal that will result in significant output reduction of gasoline in the United States, and improper market allocation of gasoline to Mexico. This output reduction and market allocation agreement is part of Defendant PMI's pending acquisition of the Deer Park refinery that is currently operated by Shell.

The result of closing the transaction would be to turn over control of the facility and its output to PEMEX, the state-owned Mexican oil company. PMI Services North America Inc. is a Delaware corporation headquartered in Houston that is controlled by PEMEX. PEMEX has made it clear in recent public statements that, once it takes control of the Deer Park Refinery, all of the output from the refinery will be allocated to the Mexican market thus reducing output available in the United States market.[1]

---

[1]      Defendants' Counsel have not disclosed the current closing date to Plaintiff's Counsel, despite repeated request, but have indicated that the deal will not close before the end of calendar year 2021 (meaning December 31). But PEMEX officials have indicated in a press conference ("Press Conference") that the deal will close in January of 2022. *See* Press Conference at https://www.youtube.com/watch?v=lkH3BTyYess for evidence on the details about the closing and other admissions by PEMEX about the deal including the intent to allocate all output from the Deer Park Refinery to Mexico. Plaintiffs' Counsel has conferred with Counsel for Defendants and the parties could not agree about disposition of a TRO.

This transaction violates the antitrust laws and should be enjoined to protect the consumer and business interests of Plaintiffs. If the Court allows this transaction to proceed there will be permanent damage to the gasoline market in the United States. Gasoline is not a renewable resource. This precious commodity should be protected from Defendants' anticompetitive conduct, which will harm Plaintiffs and not benefit the public interest or competition in any way. This deal will cause irreparable harm to Plaintiffs' energy-dependent laundry business because profits in the laundry business are directly related to the U.S. gasoline price index. Plaintiffs respectfully request that this Court grant the TRO to provide time for the Court to rule at a preliminary injunction hearing or through summary judgment.

## II.    FACTUAL BACKGROUND

The Deer Park Refinery is a petroleum refinery that was commissioned in 1929 and has been operated by Defendant Deer Park Refining Limited Partnership ("DPRLP") since 1993. (Verified Comp. at ¶ 1) Defendants Shell and PMI compete in the United States gasoline market. (Verified Comp. at 2) PMI and Shell have entered into an agreement related to the acquisition of the Deer Park Refinery. (Verified Comp. at ¶ 3) PMI is a subsidiary of Petroleos Mexicanos ("PEMEX"). (Verified Comp. at ¶ 5) On or about May 24, 2021, PMI's intention to acquire control of the Deer Park Refinery was announced. (Verified Comp. at ¶ 6) Shell seeks to however maintain an interest in the chemical plant on the same premises as the refinery. (Verified Complaint – Exhibit F).

On June 21, 2021, U.S. Congressman Brian Babin, who represents the congressional district where the Deer Park Refinery is located, sent a letter to the Biden Administration about the acquisition. (Verified Comp. at 8 - Exhibit A) These concerns were motivated – in part – by concerns over anticompetitive behavior. For example, PEMEX reneged on a $230 million contract with Texas business, Loadmaster Universal Rigs and even refused to arbitrate the dispute. (*Id*.) This misconduct of PEMEX jeopardized 2000 American jobs and harmed several dozen U.S. firms. (*Id.*) PEMEX has also engaged in anticompetitive behavior involving bribery. (*Id*.)

On July 20, 2021, United States Senators John Cornyn and Ted Cruz, along with eighteen other members of Congress, sent a letter to the President of the United States expressing more concerns about anti-competitive behavior by PEMEX. (Verified Comp. at 9 and Exhibit B) PEMEX has been engaging in recent protectionist behavior in the energy sector. (*Id.*) PEMEX seeks to preserve its oil monopoly in Mexico despite reforms that liberalized the market in 2013. (*Id*.) PEMEX has been involved in delaying and canceling permits for U.S. oil companies. (*Id*.) The anticompetitive conduct of PEMEX is raising energy costs in Mexico which impacts regional value chains and decreases competition in the U.S. (*Id*.) The Mexican government changed the law in February of 2021 to allow discretionary control over distribution, storage, import and export over fuels and oil to benefit PEMEX. (*Id*.) This law allows Mexico to suspend or revoke permits to U.S. companies in the fuel value chain to favor PEMEX. (*Id*.) PEMEX currently has 70% market share in Mexico. (*Id*.)

5

On November 17, 2021, Governor Greg Abbott sent a letter to the President of the United States expressing even more serious concerns about the anti-competitive conduct of PEMEX. (Verified Comp. at 10 – Exhibit C) PEMEX's efforts at excluding competition are being assisted by the Mexican government using militarized police forces. (*Id.*) For example, the Mexican National Guard was recently deployed to shut down fuel storage assets owned by Texas-based Monterra Energy. (*Id.*) Governor Abbott opined that this conduct is causing irreparable harm. (*Id.*)

This conduct by PEMEX is occurring at the same time that there is evidence of supracompetitive gasoline prices in the United States.[2] The President of the United States and his administration have expressed concerns that this is harming U.S. consumers. (Verified Comp. at 11, Exhibits D-E) Gasoline prices for consumers have continued to rise even as refined fuel costs go down and industry profits go up. (Verified Comp. – Exhibit D)

Usually, prices of gasoline correspond to movements in the price of unfinished gasoline, which is the main ingredient in the gasoline people buy at the pump. (*Id.*) But recently, the price of unfinished gasoline is down more than five (5) percent while gas prices at the pump are up three (3) percent in that same period. (*Id.*) This unexplained large gap between the price of unfinished gasoline and the average price for consumers is well above the pre-pandemic average. (*Id.*) The oil companies benefitting from these supracompetitive

---

[2]     Gasoline in the United States is a relevant market (i.e., a line of commerce and a section of the country) within the meaning of Section 7 of the Clayton Act. (Verified Comp. at ¶¶ 40-41).

prices, like Shell, have announced plans to engage in billions of dollars of stock buybacks and dividends. (*Id.*) Shell-branded gasoline constitutes approximately 12% of the gasoline market in the United States. (Verified Comp. at 36) Shell's share of the gasoline market is almost twice that of any of other "competitor" in the U.S. gasoline oligopoly. (Verified Comp. at ¶ 37) Dominant players, like Shell, have the power to "restore" prices to supracompetitive levels. (Verified Comp. – Exhibit E, citing Matthew Lewis, *Price Leadership and Coordination in Retail Gasoline Markets with Price Cycles*, 30 INT'L J. OF INDUS. ORG. 342 (2012)).

The proposed Deer Park Refinery transaction will reduce output, raise prices and lessen competition in the United States gasoline market. (Verified Comp. at 12, 43-50, Exhibits A-F). Gasoline refined at the Deer Park Refinery will be allocated to the Mexican market despite the market inefficiency and higher prices that will result from this allocation. (Verified Complaint at 13 - Exhibit F). The proposed Deer Park Refinery transaction is an agreement for output reduction of gasoline to the United States market and an agreement to allocate gasoline to the Mexican market. (Verified Comp. at 14). The Deer Park Refinery refines over 300,000 barrels-per-day of oil. (Verified Comp. at 15). The Deer Park Refinery is responsible for refining about two (2) percent of the crude oil in the United States. (Verified Comp. at 16). The acquisition, if consummated, would significantly

reduce the supply of gasoline in the United States. (Verified Comp. at 17) The Deer Park Refinery is one of the most productive and efficient gasoline refineries in the world.[3]

The acquisition will have the effect of permanently raising gasoline prices and energy prices for consumers and businesses like Plaintiffs. (Verified Comp. at 18) Higher gasoline prices in the United States, of course, increase Plaintiffs' costs of living. (Verified Comp. at 26)  Mr. Hagele and Mr. Sarcinella also have interests in AASH Services, LLC – which is an energy dependent coin-operated laundry business. (Verified Comp. at 27-33) Increased variable costs of energy reduce Plaintiffs' business profits in an incalculable but evident manner and threaten the entire value proposition and investment in this energy-cost-dependent business. (Verified Comp. at 28) Profits in this peculiar business are irretrievably lost as gasoline prices increase and raise energy costs. (Verified Comp. at 29) This business will lose incalculable business goodwill and customers if higher laundry prices are spurred by higher gasoline prices and energy costs. (Verified Comp. at 33) Profits in the U.S. laundry business is directly linked to the U.S. Gasoline price index.[4] (*Id*.) These damages will be difficult or impossible to calculate or collect if the deal closes. (*Id*.)

## III.   LEGAL STANDARD

The Supreme Court has stated that the "underlying purpose" of a TRO is to preserve the status quo and prevent irreparable harm just as long as is necessary to hold a hearing

---

[3]      *See* recent PEMEX presentation on the importance of the Deer Park Refinery and its output at https://www.youtube.com/watch?v=lkH3BTyYess.

[4]      *See* https://www.elsequip.com/201513gasoline-price-index-laundromat-profit/

8

and no longer. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). To obtain a temporary restraining order, a plaintiff must demonstrate that a party: (1) is likely to succeed on the merits; (2) is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Mktg. Inv'rs Corp. v. New Millennium Bank*, No. 11-cv-1696, 2011 WL 3157214, at *1 (N.D. Tex. July 26, 2011) ("[T]his court has characterized a TRO as simply a highly accelerated and temporary form of preliminary injunctive relief")

The Fifth Circuit, like other circuits, uses a sliding-scale test in which preliminary relief is appropriate when a plaintiff raises serious questions going to the merits and the balance of hardships tips sharply in the plaintiffs favor. *Humana Ins. Co. v. Tenet Health Sys., No. 16-cv-2919, 2016 WL 6893629, at *14 n.5 (N.D. Tex. Nov. 21, 2016)* ("[A] sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits.")

So long as Plaintiffs can show that the balance of equities tips sharply in their favor, they may obtain preliminary injunctive relief by raising questions "so serious, substantial, difficult, and doubtful as to make them fair ground for litigation"— Plaintiffs need not show a strong likelihood of success on the merits. *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 60 F. Supp. 2d 502, 509 (M.D.N.C. 1999) (noting the lower standard in a case where, as here, a plaintiff sought relief based on antitrust laws) "[P]laintiff need not prove his case" to obtain a TRO. *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991); see also *Univ. of*

*Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasizing that a party "is not required to prove his case in full at a preliminary injunction hearing.")

## IV.   PLAINTIFFS ARE ENTITLED TO A TRO TO PRESERVE STATUS QUO

### A.   Plaintiffs Are Likely to Prevail on Merits

The Supreme Court recently recognized that "some agreements among competitors <u>so obviously threaten to reduce output and raise prices</u> that they might be condemned as unlawful *per se* or rejected after only a quick look." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2156, 210 L. Ed. 2d 314 (2021) (emphasis added).

The Clayton Act allows private parties to seek to enjoin acquisitions that violate the antitrust laws. This transaction is an acquisition and therefore Section 7 of the Clayton Act applies.

> Section 7 of the Clayton Act is preventive in nature. Rather than relying dominantly on the government or the courts to punish individual wrongdoers, Section 7's thrust is to promote the maintenance of vigorous competition as the prime deterrent to anticompetitive acts such as artificial reductions in output. Cf. 15 U.S.C. s 1 (prohibiting conspiracies in restraint of trade); id. s 45(a) (prohibiting unfair methods of competition).

*F.T.C. v. Weyerhaeuser Co.*, 665 F.2d 1072, 1089 (D.C. Cir. 1981).

An acquisition that violates the Sherman Act also violates Section 7 of the Clayton Act. *Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1185 (N.D. Cal. 2001) (acquisition that violated Section 1 of Sherman Act was also subject to injunction pursuant to Section 7 of Clayton Act). All of the undisputed facts about this acquisition – output reduction, market allocation and exclusionary conduct in the context of a market with

supracompetitive prices – evidence illegal antitrust conduct that need not be proven with econometric experts.

The pending transaction violates the antitrust laws for several reasons, including, without limitation: enabling horizontal competitors to agree to reduce supply, allocate the market, siphon petrochemicals outside of the US and into Mexico, and collusively share sensitive information on pricing, output, and market division, all in an industry that has faced unhealthy competition and consolidation, as reflected by concern from the U.S. President, bi-partisan support in the U.S. Congress, and the Texas government, and all with the intended effect of raising prices in violation of the antitrust laws.

Defendants' sudden, purportedly immediate urge to siphon gasoline outside of the US and into Mexico—suddenly contrary to their business patterns over the past decades—should not be prioritized over the legitimate need for a preliminary injunction hearing and avoid a transaction that violates the antitrust laws.

## 1.    Acquisitions that are Output Reduction Agreements Are Prohibited

An agreement for reduction in output establishes a Section 7 violation without the need for further economic analysis. *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460, 106 S. Ct. 2009, 2019, 90 L. Ed. 2d 445 (1986) citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 86, 104 S. Ct. 2948, 2952, 82 L. Ed. 2d 70 (1984) (naked restrictions on output do not require market analysis evidence). *See also Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000)(There are two ways to prove Section 7 violation and proof of reduction in output caused by acquisition obviates need for second

"more conventional" method involving proof of relevant market and market share); *Constr. Cost Data, LLC v. Gordian Grp., Inc.*, No. CV H-16-114, 2017 WL 2266993, at *14 (S.D. Tex. Apr. 24, 2017), report and recommendation adopted, No. 4:16-CV-114, 2017 WL 2271491 (S.D. Tex. May 22, 2017)(proof of relevant market is not needed in Section 7 claim because the Supreme Court has made it clear that there are two ways of proving market power including direct evidence of anticompetitive effects*); In re Pool Prod. Distribution Mkt. Antitrust Litig.,* 940 F. Supp. 2d 367, 399 (E.D. La. 2013)(allegations of reduction of output supported antitrust claim); *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 118 (2d Cir. 2021)(direct evidence of output reductions and other manifestations of harm to consumer welfare can provide evidence of anticompetitive effect).

The proposed deal explicitly reduces output.  Defendants cannot deny that the acquisition is an agreement that will reduce output in the U.S. gasoline market and allocate gasoline to the Mexican market.[5] This acquisition and consequent reduction in output will spur higher prices in the oligopolist gasoline market that has seen rising prices and falling with massive profits for players like Shell, the dominant firm in the U.S. gasoline oligopoly. (*See* Verified Complaint and <u>Exhibits D-F</u>.)

Defendant Shell has a strong incentive to collude to reduce output into the U.S. gasoline market.  "The nature of an oligopoly makes it such that there is a substantial likelihood that—even absent an agreement—[competitors will try] to capitalize on output

---

[5]     See PEMEX statements from press conference stating that all output will go to Mexico beginning at 28:45 at  https://www.youtube.com/watch?v=lkH3BTyYess

restrictions signaled by the other, as it was in their independent interests to restrict supply and drive up prices." See *Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc*., 328 F. Supp. 3d 824, 832 (N.D. Ill. 2018).

The gasoline market functions in this way. (See <u>Exhibits D-F</u>). The gasoline market permits Shell to make pricing decisions based on actions of other gasoline sellers, rather than on cost. Thus, Shell can reasonably expect to earn higher profits by keeping prices at supracompetitive level through parallel pricing in light of high barriers to entry, inelastic demand, and stable market shares in the oligopolistic gasoline market. *White v. R.M. Packer Co.*, 635 F.3d 571 (1st Cir. 2011). The nature of this oligopoly makes it such that Shell will certainly capitalize on output restrictions to drive up gasoline prices since proof of collusion is difficult to obtain and even legal parallel conduct can raise prices in an oligopoly. *Jones v. Micron Tech. Inc*., 400 F. Supp. 3d 897, 920–21 (N.D. Cal. 2019).

When economic theory and past judicial experience with analogous restrictions demonstrate a clear anticompetitive market tendency that harm competition and consumers then the Court can determine liability without resort to detailed economic analysis. *In the Matter of Realcomp II Ltd., A Corp..,* 2009-2 Trade Cas. (CCH) ¶ 76784 (MSNET Oct. 30, 2009) A core purpose of antitrust law is to scrutinize deals that may make it easier for firms to benefit from reduced output. *Fed. Trade Comm'n v. Tronox Ltd.,* 332 F. Supp. 3d 187, 208–09 (D.D.C. 2018) This deal will allow Shell to benefit from reduced output and extract supracompetitive prices from U.S. consumers like Plaintiffs as the supply of oil on Earth continues to deplete.

Ordinarily, antitrust plaintiffs show a substantial adverse effect on competition in the relevant market with evidence that the Defendant's role in the market is such that it impairs competition significantly. "However, if a plaintiff can show 'that the restraint has actually produced significant anti-competitive effects, such as a reduction in output,' a formal market analysis is unnecessary." *Metro Industries, Inc. v. Sammi Corp.,* 82 F.3d 839, 847–48 (9th Cir.1996), quoting *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1413 (9th Cir.1991).

Plaintiffs have shown undisputed evidence of a concerted attempt by Defendants to reduce output and reduce consumer welfare in the United States. This conduct violates the antitrust laws. *Consolidated Metal Products, Inc. v. American Petroleum Inst.,* 846 F.2d 284, 292–93 (5th Cir. 1988) (any reduction in output is illegal); *Computer Automation Sys., Inc. v. Intelutions*, 998 F. Supp. 2d 3, 8 (D.P.R. 2014)( A reduction in output constitutes injury to competition).

### 2.   **Market Allocation Lessens Competition and is Prohibited under Clayton Act.**

Output reduction is not the only *per se* violation that the deal represents. "Although output reductions are   one   common   kind   of   anticompetitive   effect in antitrust cases,   a   'reduction in output' is   not   the *only* measure   of   anticompetitive effect." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015) (quoting Areeda & Hovenkamp ¶ 1503(b)(1) (emphasis in original)).

The acquisition also represents an illegal market allocation of Deer Park Refinery output. The Supreme Court has held that market allocation is so inherently anticompetitive that it is illegal *per se* without inquiry into the harm it has actually caused. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768, 104 S. Ct. 2731, 2740, 81 L. Ed. 2d 628 (1984); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608, 92 S. Ct. 1126, 1133, 31 L. Ed. 2d 515 (1972) (market allocation agreements are per se illegal antitrust conduct); *Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1185 (N.D. Cal. 2001)(acquisition that resulted in market allocation violated Section 7 of Clayton Act). This acquisition is a naked market allocation agreement for Deer Park refinery output.

### 3.    Defendants' Pending Acquisition Violates the Plain Language of Section 7

Moreover, this deal violates the plain language of Section 7 of the Clayton Act which proscribes deals the effect of which is "substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

First, the deal will tend to create a monopoly for PEMEX in Mexico.  PEMEX seeks to use this transaction to restore its monopoly status in the Mexican oil market. PEMEX now has only 70% of the Mexican market as a result of changes in Mexican competition law in 2013. But Mexican law and the goals of PEMEX have changed recently. The letters of Representative Babin, Senator Cornyn, Senator Cruz and Governor Abbott all chronicle the recent attempts to regain a PEMEX monopoly. PEMEX's march toward monopoly in Mexico

will raise gasoline prices in the United States due to impact on the gasoline value chain in the United States. (Verified Complaint – Exhibits A-F).

Second, the acquisition will lessen competition. The historic behavior of PEMEX evidences the anticompetitive intent of this acquisition. Historic behavior of parties accused of anticompetitive conduct is valid evidence of a violation of the antitrust laws. *Jones v. Micron Tech. Inc.,* 400 F. Supp. 3d 897, 921 (N.D. Cal. 2019); *In re Static Random-Access Memory Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008). The refusal of PEMEX to honor contracts in the U.S., deny and cancel permits to U.S. oil competitors and exclude competition through collusion with the military in Mexico are all facts that demonstrate that the intent of the acquisition is to lessen competition in the gasoline market in the United States. This evidence is admissible under Federal Rule of Evidence 404(b)(2) to demonstrate the anticompetitive intent of the acquisition.

### B.    Plaintiffs Will Suffer Irreparable Harm if this Deal Closes

Plaintiffs have demonstrated antitrust injury to its business and personal interests. (Verified Comp. at 26-33). This antitrust injury will be permanent because the deal will forever reduce output to the U.S. gasoline market. Plaintiffs must only demonstrate that irreparable harm is likely - not certain. "The irreparable harm must be more than an unfounded fear, but need not be an existing injury--a strong threat of injury is sufficient." *Transperfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. Jan. 12, 2009). "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable.

16

However, the mere fact that economic damages may be available does not always mean that a remedy at law is adequate." *Amegy Bank N.A. v. Monarch Flight II, LLC*, 2011 U.S. Dist. LEXIS 140874, \*16-17 (S.D. Tex. Dec. 7, 2011).

Harm is "irreparable" where it is not easily calculable or compensable by monetary damages; courts have held that lost customers and clients, lost profits and damage to goodwill satisfy this standard. *Rhino Membranes & Coatings Inc. v. Rhino Seamless Membrane Sys., Inc.*, No. CIV. 4:06-CV-2112, 2008 WL 4425583, at \*9 (S.D. Tex. Sept. 30, 2008)(continuing lost profits are irreparable harm); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief."). And "'[e]vidence of *threatened* loss of *prospective* customers or goodwill certainly supports a finding of the possibility of irreparable harm.'" *Livewirecyber, Inc. v. Lee*, 2017 WL 5640525, at \*3 (C.D. Cal. Feb. 10, 2017)(quoting *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) and citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001)) (emphases added); *see also Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) (irreparable harm found because "[Plaintiff] has provided evidence of threatened loss of customers or goodwill").

Plaintiffs have provided evidence in the Verified Complaint that establish antitrust injury in the form of lost customers, goodwill and profits. The fact that their profits are tied to the gasoline price index in the United States gives them a p antitrust injury with respect

to this transaction which will effectively raise gasoline prices. (Verified Comp. at 33)[6] As discussed more below, monetary damages and divestiture will be difficult remedies to obtain in the future.  Plaintiffs' only way to protect their interests from this anticompetitive conduct is to stop the deal from closing.

### C.    The Equities Tip Decidedly in Favor of a TRO

A TRO that simply maintains the current status quo does not impose any injury on the non-movant. *Garza Rodriguez v. Escamilla Lara*, No. DR-13-CV-077-AM, 2013 WL 12109029, at \*2 (W.D. Tex. Oct. 25, 2013) Under the status quo, Shell is operating the Deer Park refinery. The proposed closing date is in the future. This preservation of the status quo for 14 days in order to take expedited discovery and obtain a ruling from the Court will not harm Defendants in any way.

If the Court finds the acquisition is a *per* se violation of the antitrust laws, then the deal should be enjoined and Defendants suffer no harm from being prohibited from entering into an illegal transaction. But even if the Court holds a "quick look" analysis is more appropriate, the antitrust laws shift the burden onto Defendants to show empirical evidence that there are procompetitive effects that outweigh the anticompetitive impacts. *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 775, 119 S. Ct. 1604, 1615, 143 L. Ed. 2d 935 (1999). The status quo should not be allowed to change until the Defendant meets this burden, required by Supreme Court precedent on antitrust law.

If the TRO is not granted then Plaintiffs will suffer permanent irreparable harm that

---

[6]    *See* https://www.elsequip.com/201513gasoline-price-index-laundromat-profit/

cannot be recompensed in the future. Without a TRO, Defendants will close the deal within days. Plaintiffs believe that damages and divestiture will not be an effective remedy in this case. Damages will be impossible or difficult to calculate. PEMEX may become insolvent. (Verified Comp. – <u>Exhibit F</u>). Moreover, once the transaction closes, PEMEX will effectively have total control over the asset and its output and therefore may argue that divestiture is prohibited by the "act of state" doctrine. *D'Angelo v. Petroleos Mexicanos*, 422 F. Supp. 1280, 1281 (D. Del. 1976), aff'd sub nom., 564 F.2d 89 (3d Cir. 1977).

The "act of state" doctrine is not a defense available to Shell. Thus, the Court can enjoin Shell from selling its interest but may have difficulty utilizing the divestiture remedy after PEMEX takes control through PMI. Plaintiffs are concerned that this Court will not be able to "unring the bell" if the deal closes.

This transaction may result in diminished profit margins, sale of physical assets and lost vendor contracts leading to lost jobs. (Verified Complaint at 32) When a party may go out of business or jobs may be lost, this Court has granted a TRO. *Adams EMS, Inc. v. Azar*, No. CV H-18-1443, 2018 WL 3377787, at *5 (S.D. Tex. July 11, 2018) (potential for lost jobs and business loss supports granting TRO). A coin-operated laundromat cannot raise prices easily because of the fixed nature of coinage being inputted into the machines and relative inability to retrofit those machines and because its customers are generally very cost conscious.  This constraint, coupled with the sensitivity of the business to gasoline prices and energy costs, has compelled Plaintiffs to file this verified complaint seeking injunctive relief.

19

Finally, Defendants will suffer no harm from the TRO. Any alleged lost profits that Defendants may claim from this deal do not tip the equities in their favor because profits obtained from anticompetitive conduct is not a harm to Defendants. *Laboratorios Pisa S.A. De C.V. v. PepsiCo, Inc.*, No. 7:21-CV-00062, 2021 WL 783854, at *7 (S.D. Tex. Feb. 27, 2021) (A TRO should be granted when Defendants' claimed harm is lost profits from illegal conduct).

Defendants, who are horizontal competitors, have access to and share sensitive competitive information about pricing, output, and market division in connection with this crucial refinery.  They also share decision making power over these factors.  Although Shell is purportedly selling its remaining share in the refinery to PEMEX, it is still retaining control over a portion of the Deer Park facility, enabling it to still be involved with crucial decisions and having access to crucial competitive information, all with its horizontal competitor. (Verified Complaint – Exhibit F)

Defendants have been joint owners of this facility for decades and will continue to work together—as horizontal competitors— at the site after the transaction closes.  A TRO will not prejudice Defendants and will provide the appropriate timeline for the parties to brief and argue about a preliminary injunction and for the Court to address it.

### D.    A TRO is in the Public Interest

The public interest in fair competition in the marketplace supports granting a temporary restraining order in this case. *Laboratorios Pisa S.A. De C.V. v. PepsiCo, Inc.*, No. 7:21-CV-00062, 2021 WL 783854, at *9 (S.D. Tex. Feb. 27, 2021); See also *Boardman v.*

*Pac. Seafood Grp.*, 822 F.3d 1011,1024 (9th Cir. 2016) (enjoining a transaction that is likely to substantially lessen competition is in the public interest). "The public interest with which Congress was concerned in enacting Section 7 is paramount." *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1430 (W.D. Mich. 1989) Defendants' private interest in obtaining increased profits from this transaction cannot outweigh the public interest in preventing this deal from taking place until the Court rules on its legality. *Id.*

Both the executive and legislative branches have expressed concern over the U.S. gasoline market, the effects that this agreement will have on U.S. consumers and the anticompetitive conduct of PEMEX. The reduction in output is certain to raise U.S. gasoline prices. The public interest will be served if the output of the Deer Park refinery remains available to the U.S. market while the Court makes a final determination in this case. Not only will Plaintiffs obtain a peculiar benefit from an order enjoining the acquisition but all consumers of gasoline in the United States will benefit from more gasoline output to the U.S. market which will help maintain lower prices.

## V.  NO BOND SHOULD BE REQUIRED

Federal Rule of Civil Procedure 65(c) grants a court the authority to "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But the "amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court.'" *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa*

*Guzman, S.A.*, 569 F.2d. 300, 303 (5th Cir. 1978) (per curiam)).

In determining the appropriate amount, the Court may elect to require no security at all. *Id.* (quoting *Corrigan Dispatch*, 569 F.2d at 303); See also *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 235 (S.D. Tex. 2011) (citing *EOG Resources, Inc. v. Beach*, 54 F. App'x 592 (5th Cir. 2002)); *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981)(no bond required for injunction that would benefit public interest); *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016)(Court can waive security requirement under Rule 65); *Glycobiosciences, Inc. v. Woodfield Pharm.*, LLC, No. 4:15-CV-02109, 2016 WL 1702674, at *9 (S.D. Tex. Apr. 27, 2016)(bond is not always necessary in Fifth Circuit for Rule 65 injunction*); Greer's Ranch Cafe v. Guzman*, No. 4:21-CV-00651-O, 2021 WL 2092995, at *8 (N.D. Tex. May 18, 2021)(security may be waived); *Tujague v. Eckerd*, No. 4:18-CV-00408, 2018 WL 3376967, at *4 (E.D. Tex. July 11, 2018)(victim of misconduct need not post bond).

A bond is not appropriate here because (1) the non-movants will suffer no financial loss from a TRO; (2) the litigation is brought in the public interest; and (3) Plaintiffs are innocent victims of Defendants' misconduct. Defendants face no economic risk from a TRO because the closing is currently delayed until next year, so the Plaintiffs should not be required to post security in this public interest litigation to promote competition in the United States.

## IV.   CONCLUSION

Defendants have operated the refinery together since 1993. There is no conceivable

harm to Defendants if the status quo is maintained until a full hearing. Plaintiffs seek less than five depositions and need documents that have already been exchanged between Defendants and government agencies related to the transaction to prepare for the preliminary injunction hearing.[7]

The output of the refinery will continue to be available for sale into the United States market. Defendants can profit from the sale of that output while the Court considers the case. The only purpose for this transaction is to permit the parties to reduce output and profit from supracompetitive prices in the U.S. Therefore, there is no harm to Defendants from enjoining this anticompetitive deal until Plaintiffs can take expedited discovery and the Court can have a full preliminary injunction hearing in fourteen days.

Plaintiffs respectfully request that the Court stay closing of this transaction pending a hearing and ruling. This Court has the power to decide the legality of the acquisition at a hearing or even make a ruling in favor of Plaintiffs *sua sponte* under Federal Rule of Civil Procedure 56. See Edward Brunet, *Antitrust Summary Judgment and the Quick Look Approach*, 62 SMU L. Rev. 493 (2009). The request for a TRO is modest in light of the significant permanent threat to the gasoline economy in the U.S. that this acquisition poses.

The purpose of the TRO is to retain the status quo until a hearing and ruling. That is all that Plaintiffs are asking for now - nothing more, nothing less. Plaintiffs recently learned of this deal and retained counsel to ensure that their laundromat will not go out of

---

[7]     Plaintiffs will be sending a pre-motion conference letter to the Court related to expedited discovery as required by this Court's procedures. Plaintiffs have informally requested documents from Defendants but no documents have been voluntarily produced.

business—such as many others—if this transaction goes through.  Although the claims are strong, more time is needed to prepare for a preliminary injunction hearing that would be informative to the court.

WHEREFORE, Plaintiffs request that the Court enter the proposed Order for a Temporary Restraining Order.

Respectfully Submitted,


/s/ Mark T. Lavery
One of Plaintiffs' Attorneys

Christopher V. Langone
Mark T. Lavery
Langone Law LLC
2275 Half Day Road, Suite 346
Bannockburn, IL 60015
312-720-9191

James P. Batson, Esq. (pro hac vice pending)
520 White Plains Rd. Suite 500
Tarrytown, NY 10591
914-523-2278


Dated: December 28, 2021

TABLE OF AUTHORITIES

## Cases

*1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 118 (2d Cir. 2021) .................................. 12

*Adams EMS, Inc. v. Azar*, No. CV H-18-1443, 2018 WL 3377787, at *5 (S.D. Tex. July 11, 2018). 19

*Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 235 (S.D. Tex. 2011 ......................... 22

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) .......................... 17

*Amegy Bank N.A. v. Monarch Flight II, LLC*, 2011 U.S. Dist. LEXIS 140874, *16-17 (S.D. Tex. Dec. 7, 2011)............................................................................................................................................ 17

*Areeda & Hovenkamp ¶ 1503(b)(1)* ............................................................................................... 14

*Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1413 (9th Cir.1991 ...................................................... 14

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011,1024 (9th Cir. 2016) ............................................. 21

*California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 775, 119 S. Ct. 1604, 1615, 143 L. Ed. 2d 935 (1999)....................................................................................................................................... 18

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ......... 22

*Computer Automation Sys., Inc. v. Intelutions*, 998 F. Supp. 2d 3, 8 (D.P.R. 2014 ......................... 14

*Consolidated Metal Products, Inc. v. American Petroleum Inst.,* 846 F.2d 284, 292–93 (5th Cir. 1988)......................................................................................................................................... 14

*Constr. Cost Data, LLC v. Gordian Grp., Inc.,* No. CV H-16-114, 2017 WL 2266993, at *14 (S.D. Tex. Apr. 24, 2017)...................................................................................................................... 12

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768, 104 S. Ct. 2731, 2740, 81 L. Ed. 2d 628 (1984);..................................................................................................................................... 15

*Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d. 300, 303 (5th Cir. 1978).......................... 22

*D'Angelo v. Petroleos Mexicanos*, 422 F. Supp. 1280, 1281 (D. Del. 1976), aff'd sub nom., 564 F.2d 89 (3d Cir. 1977) ...................................................................................................................... 19

*eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ............................... 17

Edward Brunet, *Antitrust Summary Judgment and the Quick Look Approach*, 62 SMU L. Rev. 493 (2009)....................................................................................................................................... 23

*EOG Resources, Inc. v. Beach*, 54 F. App'x 592 (5th Cir. 2002)) ..................................................... 22

*F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460, 106 S. Ct. 2009, 2019, 90 L. Ed. 2d 445 (1986) ...................................................................................................................................... 11

*F.T.C. v. Weyerhaeuser Co.*, 665 F.2d 1072, 1089 (D.C. Cir. 1981). ................................................ 10

*Fed. Trade Comm'n v. Tronox Ltd.,* 332 F. Supp. 3d 187, 208–09 (D.D.C. 2018)............................ 13

*Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016.................................... 22

*Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1185 (N.D. Cal. 2001) ............................. 10

*Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1185 (N.D. Cal. 2001)(............................ 15

*Garza Rodriguez v. Escamilla Lara*, No. DR-13-CV-077-AM, 2013 WL 12109029, at *2 (W.D. Tex. Oct. 25, 2013).......................................................................................................................... 18

*Glycobiosciences, Inc. v. Woodfield Pharm.*, LLC, No. 4:15-CV-02109, 2016 WL 1702674, at *9 (S.D. Tex. Apr. 27, 2016)................................................................................................................... 22

*Greer's Ranch Cafe v. Guzman*, No. 4:21-CV-00651-O, 2021 WL 2092995, at *8 (N.D. Tex. May 18, 2021)( ................................................................................................................................................. 22

*Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ........................................ 17

*Humana Ins. Co. v. Tenet Health Sys.*, No. 16-cv-2919, 2016 WL 6893629, at *14 n.5 (N.D. Tex. Nov. 21, 2016) ...................................................................................................................................... 9

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 399 (E.D. La. 2013)(....... 12

*In re Static Random-Access Memory Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008). . 16

*In the Matter of Realcomp II Ltd., A Corp..*, 2009-2 Trade Cas. (CCH) ¶ 76784 (MSNET Oct. 30, 2009).................................................................................................................................................... 13

*Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 920–21 (N.D. Cal. 2019)...................................... 13

*Jones v. Micron Tech. Inc.,* 400 F. Supp. 3d 897, 921 (N.D. Cal. 2019............................................. 16

*Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).......................................................... 21

*Laboratorios Pisa S.A. De C.V. v. PepsiCo, Inc.*, No. 7:21-CV-00062, 2021 WL 783854, at *7 (S.D. Tex. Feb. 27, 2021)............................................................................................................................... 20

*Laboratorios Pisa S.A. De C.V. v. PepsiCo, Inc.*, No. 7:21-CV-00062, 2021 WL 783854, at *9 (S.D. Tex. Feb. 27, 2021);............................................................................................................................. 20

*Livewirecyber, Inc. v. Lee*, 2017 WL 5640525, at *3 (C.D. Cal. Feb. 10, 2017) ................................ 17

*Metro Industries, Inc. v. Sammi Corp.,* 82 F.3d 839, 847–48 (9th Cir.1996) .................................... 14

*Mktg. Inv'rs Corp. v. New Millennium Bank*, No. 11-cv-1696, 2011 WL 3157214, at *1 (N.D. Tex. July 26, 2011)....................................................................................................................................... 9

*Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2156, 210 L. Ed. 2d 314 (2021) .............. 10

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 86, 104 S. Ct. 2948, 2952, 82 L. Ed. 2d 70 (1984) .................................................................................................... 11

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015............................ 14

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 60 F. Supp. 2d 502, 509 (M.D.N.C. 1999).............. 9

*Rhino Membranes & Coatings Inc. v. Rhino Seamless Membrane Sys., Inc.*, No. CIV. 4:06-CV-2112, 2008 WL 4425583, at *9 (S.D. Tex. Sept. 30, 2008) ......................................................................... 17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001)) ............................ 17

*Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000 ............................................................ 11

*Transperfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. Jan. 12, 2009)......... 16

*Tujague v. Eckerd*, No. 4:18-CV-00408, 2018 WL 3376967, at *4 (E.D. Tex. July 11, 2018)............. 22

*United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1430 (W.D. Mich. 1989)........................................ 21

*United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608, 92 S. Ct. 1126, 1133, 31 L. Ed. 2d 515 (1972) ................................................................................................................................................... 15

*Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 832 (N.D. Ill. 2018).................................................................................................................................................... 13

*White v. R.M. Packer Co.*, 635 F.3d 571 (1st Cir. 2011...................................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)............................................................... 9