# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **Aaron Hagele, Andrew Sarcinella, Jr., and AASH Services, LLC,** | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. 4:21-cv-04103 |
| **Shell Oil Company, PMI Services North America Inc., and Deer Park Refining Limited Partnership**, | § § § | |
| *Defendants*. | § § § | |

## DEFENDANTS' MOTION TO DISMISS
## UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)

Michael T. Murphy
WINSTON & STRAWN LLP
800 Capitol St., Suite 2400
Houston, TX 77002
Telephone: (713) 651-2600

Aldo A. Badini
Marcelo M. Blackburn
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700

*Attorneys for Defendant PMI Services North America, Inc.*

Layne E. Kruse
Carlos R. Rainer
Anne M. Rodgers
Eliot F. Turner
Luke A. Schamel
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:     (713) 651-5151

*Attorneys for Defendants Shell Oil Company and Deer Park Refining Limited Partnership*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS .................................................................. 3

PLAINTIFFS' ALLEGATIONS ............................................................................................... 3

STANDARDS OF DECISION................................................................................................... 4

ARGUMENT AND AUTHORITIES ........................................................................................ 5

      1.      Plaintiffs lack Article III and antitrust standing to bring an antitrust claim because they fail to allege injury or their alleged injury is far too remote from any alleged antitrust violation. ......................................................................... 5

      2.      Plaintiffs have failed to allege an antitrust injury because their alleged injury has nothing to do with whether the proposed acquisition is anticompetitive................................................................................................... 10

      3.      Plaintiffs have failed to state an antitrust claim because their allegations are purely speculative, conclusory, and implausible. ............................................. 12

      4.      Plaintiffs have failed to show they are appropriate plaintiffs. ............................. 16

      5.      Plaintiffs' remaining allegations about anticompetitive effects are conclusory and insufficient to state a claim................................................................ 18

      6.      Granting plaintiffs the extreme and belated injunctive relief that they seek would be inequitable. ....................................................................................... 20

CONCLUSION............................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re American Express Anti-Steering Rules Antitrust Litigation*,
   19 F.4th 127 (2d Cir. 2021) ........................................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................5, 20

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)..............................................................................................6, 17

*In re Beef Indus. Antitrust Litig*,
   600 F.2d 1148 (5th Cir. 1979) ...................................................................................8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................5, 19, 20

*Torch Liquidating Tr.* ex rel. *Bridge Assocs. L.L.C. v. Stockstill*,
   561 F.3d 377 (5th Cir. 2009) .....................................................................................5

*Broadcom, Inc. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007)......................................................................................23

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)..................................................................................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)......................................................................................10, 11, 12

*California v. Am. Stores Co.*,
   495 U.S. 271 (1990)..................................................................................................21

*Chi. Bridge & Iron Co. N.V. v. FTC*,
   534 F.3d 410 (5th Cir. 2008) ...................................................................................12

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)..............................................................................................6, 14

*Collins v. Morgan Stanley Dean Witter*,
   224 F.3d 496 (5th Cir. 2000) .....................................................................................4

*Cont'l Auto. Sys. v. Avanci, LLC*,
   485 F. Supp. 3d 712 (N.D. Tex. 2020) ....................................................................17

*Daniel v. Univ. of Tex. Sw. Med. Ctr.*,
   960 F.3d 253 (5th Cir. 2020) ................................................................................5

*DeHoog v. Anheuser-Busch InBev SA/NV*,
   899 F.3d 758 (9th Cir. 2018) ................................................................................7

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All.*,
   123 F.3d 301 (5th Cir. 1997) .............................................................................16

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
   732 F.2d 480 (5th Cir. 1984) .............................................................................13

*In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*,
   668 F.3d 281 (5th Cir. 2012) ................................................................................4

*Garabet v. Autonomous Techs. Corp.*,
   116 F. Supp. 2d 1159 (C.D. Cal. 2000) .............................................................17

*In re Gee*,
   941 F.3d 153 (5th Cir. 2019) .............................................................................14

*Ginsburg v. InBev NV/SA*,
   623 F.3d 1229 (8th Cir. 2010) .....................................................................21, 22

*Ginzburg v. Mem'l Healthcare Sys., Inc.*,
   993 F. Supp. 998 (S.D. Tex. 1997) ....................................................................17

*Hawaii v. Standard Oil Co.*,
   405 U.S. 251 (1972)..............................................................................................6

*Home Builders Ass'n, Inc. v. City of Madison*,
   143 F.3d 1006 (5th Cir. 1998) ..............................................................................4

*Ill. Brick Co. v. Illinois*,
   431 U.S. 720 (1977)............................................................................................12

*Jebaco, Inc. v. Harrah's Operating Co.*,
   587 F.3d 314 (5th Cir. 2009) ..................................................................10, 11, 12

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)......................................................................................5, 6, 9

*Machete Prods., LLC v. Page*,
   809 F.3d 281 (5th Cir. 2015) ................................................................................5

*McCormack v. NCAA*,
   845 F.2d 1338 (5th Cir. 1988) ..................................................................6, 16, 17

*In re Mun. Bond Reporting Antitrust Litig.*,
    672 F.2d 433 (5th Cir. 1982) ..........................................................................9, 10

*Norris v. Hearst Tr.*,
    500 F.3d 454 (5th Cir. 2007) ..........................................................................4, 16

*Pan-Islamic Trade Corp. v. Exxon Corp.*,
    632 F.2d 539 (5th Cir. 1980) ..............................................................................9

*Perkins v. Standard Oil Co.*,
    395 U.S. 642 (1969)............................................................................................9

*Phototron Corp. v. Eastman Kodak Co.*,
    842 F.2d 95 (5th Cir. 1992) ..............................................................................21

*Romani v. Shearson Lehman Hutton*,
    929 F.2d 875 (1st Cir. 1991) ..............................................................................4

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
    802 F.3d 732 (5th Cir. 2015) ..........................................................................5, 6

*Shipp v. McMahon*,
    199 F.3d 256 (5th Cir. 2000) ............................................................................23

*Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..............................................................................5

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)..............................................................................................6

*Stripling v. Jordan Prod. Co.*,
    234 F.3d 863 (5th Cir. 2000) ............................................................................23

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*,
    309 F.3d 836 (5th Cir. 2002) ............................................................................16

*Symetra Life Ins. Co. v. Rapid Settlements Ltd.*,
    612 F. Supp. 2d 759 (S.D. Tex. 2007) (Rosenthal, J.)......................................21

*United States v. Baker Hughes Inc.*,
    908 F.2d 981 (D.C. Cir. 1990)..........................................................................12

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)..........................................................................................19

*United States v. Cont'l Can Co.*,
    378 U.S. 441 (1964)..........................................................................................13

*United States v. Marine Bancorporation, Inc.*,
 418 U.S. 602 (1974)...................................................................................12

*Universal Brands, Inc. v. Philip Morris Inc.*,
 546 F.2d 30 (5th Cir. 1977) ..........................................................................9

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
 987 F.2d 429 (7th Cir. 1993) .........................................................................4

*Westfall v. Miller*,
 77 F.3d 868 (5th Cir. 1996) ...........................................................................5

**Rules and Statutes**

15 U.S.C. § 1 ......................................................................................................18

15 U.S.C. § 18 ................................................................................................2, 12

15 U.S.C. § 26 ....................................................................................................20

Fed. R Civ. P. 12(b)(1)..............................................................................4, 5, 23

Fed. R Civ. P.  12(b)(6) .....................................................................................3, 5

**Other Authorities**

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and
 Procedure § 1327 (2d ed. 1990)....................................................................4

Christopher T. Taylor & Daniel S. Hosken, *The Economic Effects of the
 Marathon - Ashland Joint Venture: The Importance of Industry Supply Shocks
 and Vertical Market Structure* (May 7, 2004),
 https://www.ftc.gov/sites/default/files/documents/reports/economic-effects-
 marathon-ashland-joint-venture-importance-industry-supply-shocks-and-
 vertical/wp270.pdf .......................................................................................13

FTC Staff Technical Report, *Robustness of the Results in GAO's 2004 Report
 Concerning Price Effects of Mergers and Concentration Changes in the
 Petroleum Industry* (Dec. 21, 2004),
 https://www.ftc.gov/system/files/documents/reports/ftc-staff-technical-report-
 robustness-results-gaos-2004-report-concerning-price-effects-
 mergers/ftcstafftechnicalreport122104.pdf .................................................13

Press Release, *Shell to sell interest in Deer Park refinery to partner Pemex* (May
 24, 2021), https://www.shell.com/media/news-and-media-releases/2021/shell-
 to-sell-interest-in-deer-park-refinery-to-partner-pemex.html ...............1, 3

Statement of the Federal Trade Commission Concerning Dismissal of the
   Administrative Complaint, *Paul L. Foster, Western Refining, Inc., and Giant
   Indus., Inc.* (Oct. 3, 2007),
   https://www.ftc.gov/system/files/documents/public_statements/568571/07100
   3statement.pdf ..........................................................................................................13

Statement of the Federal Trade Commission, *Sunoco Inc../Coastal Eagle Point
   Oil Co.* (Dec. 29, 2003),
   https://www.ftc.gov/sites/default/files/documents/cases/2003/12/031229stmt0
   310139.pdf .......................................................................................................14, 16

Statement of the Federal Trade Commission, *Tesoro Corp. / BP p.l.c.* (May 17,
   2003),
   https://www.ftc.gov/sites/default/files/documents/closing_letters/tesoro-
   corporation/bp-p.l.c./130517tesoro_bpstmtofcomm.pdf .......................................15

U.S. Energy Information Administration, *Petroleum & Other Liquids: Exports*
   (Nov. 30, 2021), https://www.eia.gov/dnav/pet/pet_move_exp_dc_NUS-
   Z00_mbblpd_m.htm .........................................................................................15

U.S. Energy Information Administration, *Petroleum & Other Liquids: Imports by
   Area of Entry* (Nov. 20, 2021),
   https://www.eia.gov/dnav/pet/pet_move_imp_dc_NUS-Z00_mbblpd_m.htm .....................15

**INTRODUCTION AND SUMMARY OF ARGUMENT**

On May 24, 2021, Shell Oil Company (Shell) and PMI Services North America, Inc. (PMI) announced that PMI would acquire Shell's interest in their joint venture, the Deer Park Refining Limited Partnership, which operates a refinery in Deer Park, Texas, in a deal valued at $596 million dollars. Doc. 2 ¶¶ 6, 42; *see also* Press Release, *Shell to sell interest in Deer Park refinery to partner Pemex* (May 24, 2021), https://www.shell.com/media/news-and-media-releases/2021/shell-to-sell-interest-in-deer-park-refinery-to-partner-pemex.html.

Nearly eight months later, on the eve of the sale's expected closing and despite no action from the Federal Trade Commission (FTC), the Committee on Foreign Investment in the United States (CFIUS), or any other governmental agency to challenge the transaction, three plaintiffs—a coin-operated laundromat in Mt. Vernon, New York, and its two New York owners—with no connection to the Deer Park refinery, either apparent or alleged, sued trying to enjoin the transaction. Doc. 2 ¶ 51.

The plaintiffs claim that the sale of a partnership interest in a refinery by one Delaware corporation, Shell, to another Delaware corporation, PMI,[1] would violate Section 7 of the Clayton Act. Plaintiffs' theory is that if the sale is allowed, PMI will export all of the Deer Park refinery's gasoline production to Mexico. This, they say, will increase gasoline prices throughout the United States, causing the individual plaintiffs to pay more at the pump (although they do not allege that the gasoline they purchase in New York comes from the Deer Park refinery) and affect their laundromat as "the laundry industry is particularly sensitive to increases in energy costs." Doc. 2 ¶ 30. The complaint does not allege that the laundromat plaintiff, AASH Services, LLC,

---

[1] While plaintiffs allege that "PMI is a subsidiary of Petroleos Mexicanos ('PEMEX')," Doc. 2 ¶ 5, they fail to allege any facts that would justify piercing the corporate veil to treat PEMEX as the alter ego of PMI.

purchases gasoline, Doc. 2 ¶ 25, or that, in fact, AASH even uses gasoline as its energy source. There is also no indication of whether or how the laundry industry is affected by allegedly increased prices for gasoline, beyond supposing that increased gasoline prices may force the laundromat's customers to choose between buying gasoline or washing clothes.

Plaintiffs' complaint should be dismissed both because plaintiffs lack Article III and antitrust standing and because they fail to state a claim under Section 7 of the Clayton Act, which prohibits acquisitions where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Plaintiffs' claims should be dismissed for five reasons:

1. Plaintiffs lack both Article III and antitrust standing to sue for speculative, hypothetical, and remote injuries that may never occur and which they have not plausibly alleged are caused by defendants' conduct.

2. Plaintiffs have not pleaded an antitrust injury, that is, an injury caused by the alleged antitrust violation and that also corresponds to the reasons antitrust laws forbid certain conduct.

3. Plaintiffs have failed to allege plausible facts suggesting that the acquisition would substantially lessen competition and thus violate Section 7 of the Clayton Act.

4. Plaintiffs have failed to show that, even if the transaction were plausibly anticompetitive, they would be the appropriate plaintiffs.

5. Plaintiffs, by suing months after the transaction was announced and on the eve of its closing, have failed to show they are entitled to injunctive relief—the only remedy claimed in their complaint.

## NATURE AND STAGE OF THE PROCEEDINGS

This is an antitrust case. On December 16, 2021, plaintiffs sued defendants under Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits acquisitions that may substantially lessen competition or tend to create a monopoly. Defendants now move to dismiss plaintiffs' complaint under Rules 12(b)(1) and 12(b)(6).

## PLAINTIFFS' ALLEGATIONS

Since the early 1990s, PMI and Shell have operated a refinery in Deer Park, Texas. They have done so as part of a joint venture—Deer Park Refining Limited Partnership. The refinery, according to plaintiffs, "sometimes" produces up to 2.5% of the gasoline refined in the United States every day. Doc. 2 ¶ 44. In May 2021, defendants announced that PMI would be acquiring Shell's 50.005% interest in the Deer Park refinery.[2]

Plaintiffs Aaron Hagele and Andrew Sarcinella, Jr. are New York residents. Doc. 2 ¶ 23. They own a coin-operated laundromat in Mt. Vernon, New York, called AASH Services, LLC. Doc. 2 ¶¶ 24, 27. The laundromat is also a plaintiff. Plaintiffs claim that if PMI is allowed to buy Shell's interest in the Deer Park refinery, the refinery will export more gasoline to Mexico, and this will lead to higher gasoline prices throughout the United States. Doc. 2 ¶ 43. Plaintiffs do not allege any facts suggesting an agreement between PMI and Shell to do so.

According to plaintiffs, the laundry business is "energy-dependent," so when gasoline prices increase, their business's profits decrease. Doc. 2 ¶¶ 27, 29. Plaintiffs do not allege that their business buys gasoline. While plaintiffs do allege that they buy gasoline in their individual capacities, they do not allege whether that gasoline comes from the Deer Park refinery (or how it

---

[2] Press Release, *Shell to sell interest in Deer Park refinery to partner Pemex* (May 24, 2021), https://www.shell.com/media/news-and-media-releases/2021/shell-to-sell-interest-in-deer-park-refinery-to-partner-pemex.html.

might) or even whether they buy it from either defendant. Doc. 2 ¶¶ 25. They also allege that increased gasoline prices will have a domino-effect that ends in harm to their business: Increased gasoline prices may cause potential customers to limit discretionary spending, which will "likely" cause them to spend less money at the laundromat. Doc. 2 ¶ 33. No specific facts are alleged to support this Rube-Goldberg theory of harm.

On these inadequate allegations, plaintiffs are trying to stop the more than half-a-billion dollar sale of a half-interest in the Deer Park refinery, which has almost 1,000 refinery workers. Right before the winter holidays, almost eight months after defendants announced the deal, after massive amounts of transition work, and despite no action from the FTC, CFIUS or any other governmental agency to challenge the transaction,[3] three New York residents are wrongly suing to enjoin the transaction under Section 7 of the Clayton Act.

## STANDARDS OF DECISION

Rule 12(b)(1) requires dismissal of a claim if a court "'lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006,

---

[3] While the complaint alleges that a congressman wrote a letter requesting that CFIUS "deny the sale," Doc. 2 ¶ 8, in fact, the letter itself, attached as Exhibit A to the complaint, requests that CFIUS "initiate a full security review, including *possible* denial of this proposed sale." Doc. 2-1 (emphasis added). CFIUS has now completed that review and decided to permit the sale. Ex. A, Letter from B. Reissaus to D. Fagan (Dec. 21, 2021) ("CFIUS has reviewed the information provided to it regarding the transaction . . . Based upon its review and investigation, and after full consideration of all relevant national security factors . . . CFIUS has determined that there are no unresolved national security concerns."). Although a plaintiff does not have to attach to the complaint documents on which the action is based, a defendant may introduce certain pertinent documents if the plaintiff failed to do so. *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n.3 (1st Cir. 1991) (citing 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1327 at 762–63 (2d ed. 1990)). This Court can consider what a defendant has attached to a motion to dismiss as "part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). The court may also "take judicial notice of matters of public record" when deciding a motion to dismiss. *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

1010 (5th Cir. 1998)). Plaintiffs, as the parties invoking subject matter jurisdiction, must show it exists. *Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 256 (5th Cir. 2020). In considering a Rule 12(b)(1) motion, a court assumes the complaint's factual allegations are true, but need not accept "a legal conclusion couched as a factual allegation." *Id.* (quoting *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015)).

Rule 12(b)(6) requires dismissal of claims when a plaintiff's allegations are not "plausible" and fail to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). A complaint must have "direct allegations or permit properly drawn inferences to support every material point necessary to sustain a recovery." *Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) (internal quotation marks and citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And courts "will not 'strain to find inferences favorable to the plaintiff[]'" or "accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)).

## ARGUMENT AND AUTHORITIES

1.   **Plaintiffs lack Article III and antitrust standing to bring an antitrust claim because they fail to allege injury or their alleged injury is far too remote from any alleged antitrust violation.**

As with any other claim, an antitrust plaintiff must show that it has standing under Article III. *See Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015). Article III standing has three elements: (1) an injury in fact (2) caused by the defendant's conduct (3) that would likely be redressed by the remedy the plaintiffs seek. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The first element—injury in fact—requires that a plaintiff's injury be

both concrete and particularized and actual or imminent. *Id.* at 560. "'[A]llegations of *possible* future injury' are not sufficient" to establish an injury in fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). In addition, a plaintiff must establish "causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

Apart from Article III standing, an antitrust plaintiff must also establish "antitrust standing." *Sanger*, 802 F.3d at 737. Among other things, this requires showing "an injury to the plaintiff proximately caused by the defendants' conduct." *Id.* The requirement is stricter than that what is needed to show causation under Article III. *Id.* at 737 n.5. Indeed, the antitrust laws do not allow plaintiffs to assert claims for "all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). Whether a plaintiff can satisfy this stricter requirement depends on "the directness or indirectness of the asserted injury," such as whether "the chain of causation" contains "vaguely defined links." *Id.* at 540. Indeed, a "'speculative' and 'abstract' causal chain" cannot show standing. *McCormack v. NCAA*, 845 F.2d 1338, 1342 (5th Cir. 1988).

Here, plaintiffs lack both Article III and antitrust standing. The injuries they claim are both speculative and far too remote to have been caused by the transaction they challenge.

Indeed, plaintiffs have alleged no connection between themselves and the Deer Park refinery, explained why their might be such a connection, or explained how increased gasoline exports from the refinery would increase gasoline prices.

The gasoline blend stock produced at refineries like Deer Park is a commodity traded and transported within and between regions of the United Sates, as well as internationally. Plaintiffs

assert that the transaction will lead to higher retail gasoline prices for them and their laundromat's customers in New York because PMI will export the refinery's gasoline to Mexico. But plaintiffs allege no facts supporting this assertion. Beyond saying that the Deer Park refinery "sometimes produces about 2.5% of the daily refined gasoline in the United States," Doc. 2 ¶ 44, plaintiffs make no allegations about the dynamics of the largest gasoline market in the world that would create a "fairly traceable connection" between the Deer Park transaction and the retail gasoline that plaintiffs and their customers buy.

Among other obvious factors that might affect the price of gasoline, plaintiffs make no allegations about: the share of domestic U.S. gasoline produced at the Deer Park refinery over any sustained time; the amount of gasoline that is currently exported to Mexico from the Deer Park refinery and other refineries in the United States; the amount of gasoline imported into the United States, particularly into the New York Harbor trading hub that is about 50 miles from plaintiffs' community in Mt. Vernon; whether the United States currently has an excess or shortage of refining capacity; whether, if PMI exports gasoline to Mexico, other U.S. refiners would increase domestic output or other importers would increase imports; or how any of these factors will evolve in the months and years after the transaction closes.

In short, the plaintiffs allege no more than their say-so that increased exports of gasoline from a single refinery to Mexico, which may never occur, *see infra* pp. 14–16, will increase retail gasoline prices throughout the United States. That sort of conclusory allegation is not enough to state a claim, let alone to enjoin a merger or acquisition. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018) (affirming dismissal of claim because consumers' allegation that acquisition would cause beer prices to increase was speculative).

Besides being speculative, plaintiffs' alleged injuries are factually unconnected to the challenged acquisition. Thus, plaintiffs lack standing.

Plaintiff AASH Services, LLC does not allege that it buys any gasoline. And the individual plaintiffs do not allege where they buy gasoline or even that the gasoline they buy comes from the Deer Park refinery—over 1,600 miles away from Mt. Vernon, New York. In fact, they do not allege any connection to Shell, PMI, or the Deer Park refinery. According to plaintiffs, no matter where they buy gasoline or whether the gasoline they currently buy comes from the Deer Park refinery, the transaction will allegedly cause them to pay more for gasoline. But were plaintiffs found to have standing, that would mean *every* person who buys gasoline in the United States and every business with customers who buy gasoline in the United States would have standing to challenge this transaction. That cannot be. Indeed, courts have consistently rejected the idea that where a transaction will raise prices generally, any entity or consumer can sue whether or not they buy products from the defendants.

For example, the Second Circuit recently rejected a similar theory in *In re American Express Anti-Steering Rules Antitrust Litigation*, 19 F.4th 127 (2d Cir. 2021). There, merchants who did not accept American Express cards sued American Express because they contended that American Express's antitrust violations allowed American Express's credit card competitors to increase the prices they charged to the plaintiffs. The Second Circuit held that whatever connection there might be between American Express's conduct and the fact it allowed American Express's competitors to charge the plaintiffs higher prices, "the injuries . . . were not proximately caused by Amex" and thus the plaintiffs lacked antitrust standing. *Id.* at 141, 143.

Courts sensibly reject such claims because this theory would allow plaintiffs to recover for derivative injuries that are unconnected to the alleged antitrust violation. *See*

*Antitrust Litig*, 600 F.2d 1148, 1168 (5th Cir. 1979). "Not everyone 'arguably injured by an antitrust violation may bring suit. Even though an individual may suffer a pocketbook injury, he must be the "target" of an anti-competitive practice before he may sue.'" *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 433, 435 (5th Cir. 1982) (quoting *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 546 (5th Cir. 1980)). "[T]he law is clear that 'one who is only *incidentally* injured by a violation of the antitrust laws,--the bystander who was hit but not aimed at,--cannot recover against the violator.'" *Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 35 (5th Cir. 1977) (quoting *Perkins v. Standard Oil Co.*, 395 U.S. 642, 649 (1969)). Here, even if the conclusory allegations that the transaction will raise gasoline prices could be credited, plaintiffs cannot have standing without establishing a connection between plaintiffs and defendants. Were it otherwise, every American consumer would have standing to enjoin every M&A transaction affecting a consumer product or service, no matter how remote (or nonexistent) their connection to the merging parties.

The laundromat's case for standing is even worse than that of the individual plaintiffs. The laundromat does not allege that it buys gasoline, merely that exports of gasoline from the Deer Park refinery would "permanently rais[e] . . . energy prices" and that "increased variable costs of energy reduce" the laundromat's profits. Doc. 2 ¶¶ 18, 28. The laundromat claims it may also lose business because higher gasoline prices may force its customers to choose to buy "gas and food before laundry services." Doc. 2 ¶ 33. But even were the plaintiffs to have plausibly alleged that the transaction would raise gasoline prices, the laundromat's claimed injury is "th[e] result [of] the independent action of some third party"—gasoline service stations or the laundromat's customers—"not before the Court." *Lujan*, 504 U.S. at 562 (alterations in original). That means the laundromat's "injury" is not fairly traceable to defendants, so the laundromat lacks standing

under Article III. But even if it did not, such a "speculative and abstract" causal chain could not support antitrust standing. *Mun. Bond Reporting*, 672 F.2d at 436 ("Whatever injury the plaintiffs may have sustained, their claims are entirely speculative and are not redressable under the antitrust laws.").

2. **Plaintiffs have failed to allege an antitrust injury because their alleged injury has nothing to do with whether the proposed acquisition is anticompetitive.**

To state an antitrust claim, a private plaintiff must also allege an antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This injury requirement is separate and more rigorous than Article III's injury-in-fact requirement. *See Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318 (5th Cir. 2009). Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* at 319 (quoting *Brunswick*, 429 U.S. at 489).

For example, the *Brunswick* plaintiff claimed that the defendant's acquisition of several failing bowling alleys, which competed with the plaintiff, violated the antitrust laws. 429 U.S. at 479–81. The acquisition allegedly injured the plaintiff because, had the alleys closed rather than be acquired, the plaintiff's profits would have increased. *Id.* at 481. The Supreme Court held that if these acquisitions were unlawful under the antitrust laws, they were so "because they brought a 'deep pocket' parent into a 'market of pygmies,'" which might have allowed this newly combined business to defeat competition. *Id.* at 487. But that did not mean the plaintiff could sue; the alleged "injury—the loss of income that would have accrued [to the plaintiff] had the acquired [alleys] gone bankrupt—[bore] no relationship to the size of either the acquiring company or its competitors." *Id.* That is, the plaintiff's injury had nothing to do with whether the defendant was a monopolist or whether the acquisitions created monopoly power. The plaintiff "would have suffered the identical 'loss' but no compensable injury had the acquired [alleys] instead obtained

10

refinancing or been purchased by 'shallow pocket' parents." *Id.* Because the plaintiff's injury was not "of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful," it was not an antitrust injury. *Id.* at 489.

Similarly, the Fifth Circuit in *Jebaco* affirmed the dismissal of a plaintiff's claims because the plaintiff had not alleged an antitrust injury. There, the plaintiff had an interest in several riverboat gambling berths and was paid per-patron fees at these berths. *Jebaco*, 587 F.3d at 316. One of the defendants operated a riverboat casino in these berths until a hurricane hit the area, after which the defendant stopped operating at this location and sold its riverboats and related assets to the other defendant. *Id.* The plaintiff sued, alleging that the defendants entered into a market-allocation agreement that caused the plaintiff to lose the per-patron fees. *Id.* at 318. The court, however, held that "the market division ha[d] little or nothing to do" with the plaintiff's lost fees. *Id.* at 320.

> Had [the defendant] remained at [the plaintiff's] preferred berths and kept paying
> fees, the alleged market division would still have occurred and [the plaintiff] would
> have been uninjured. Alternatively, if a different firm had purchased [the] assets, it
> too might have chosen not to operate at [the plaintiff's] preferred berths. No
> antitrust violation would have occurred, but [the plaintiff] would have suffered the
> same injury.

*Id.* In other words, the plaintiff did not suffer an antitrust injury because that injury had nothing to do with whether the defendants' actions were anticompetitive.

The same is true for plaintiffs here. Plaintiffs' injuries have nothing to do with whether the acquisition violates Section 7. For example, plaintiffs complain that as a result of the acquisition, the refinery will export more gasoline to Mexico, thereby increasing gasoline prices in the United States. But they do not allege why the refinery could not export all its gasoline to Mexico today (or even how much gasoline from the refinery is currently exported to Mexico). Were the refinery to do so, plaintiffs' claimed injury—the supposed increase in gasoline prices caused by increased

exports to Mexico—would be the same even without the acquisition that they contend is anticompetitive. *See id.* ("No antitrust violation would have occurred, but [the plaintiff] would have suffered the same injury.").

In other words, plaintiffs' injury does not depend on whether defendants' actions violate the antitrust laws; it depends only on whether gasoline prices increase. And any number of things might increase gasoline prices. For example, if the refinery were to close for maintenance for a long time, that would cause gasoline prices to increase under plaintiffs' theory, independent of any antitrust violation. Plaintiffs' injury is therefore not "of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick*, 429 U.S. at 489.

### 3. Plaintiffs have failed to state an antitrust claim because their allegations are purely speculative, conclusory, and implausible.

Plaintiffs have also failed to allege sufficient facts to support their single claim for injunctive relief under Section 7 of the Clayton Act. Section 7 prohibits acquisitions that "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.[4] Plaintiffs' complaint, however, offers only conclusory allegations that the acquisition will be anticompetitive.

To state a Section 7 claim, generally a plaintiff must "show[] that a transaction will lead to undue concentration in the market for a particular product in a particular geographic region." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990); *see also Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008) (same). Section 7, however, "deals in 'probabilities,' not 'ephemeral possibilities,'" *United States v. Marine Bancorporation, Inc.*, 418

---

[4] The laundromat plaintiff does not allege it bought gasoline at all. And the individual plaintiffs do not allege that they purchase gasoline directly from either defendant or even that they purchase gasoline that is produced at the Deer Park refinery. As, at best, "indirect purchasers" of gasoline, plaintiffs cannot sue to recover damages under federal antitrust laws. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 734–35 (1977).

U.S. 602, 622–23 (1974) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)), so

a plaintiff seeking to enjoin an acquisition under Section 7 must show that a substantial lessening

of competition from the acquisition will be "sufficiently probable and imminent," *United States v.

Cont'l Can Co.*, 378 U.S. 441, 458 (1964).[5]

Plaintiffs' allegations fail to establish that the transaction will substantially lessen

competition in any market. "[T]he first step in analyzing a [Section 7] claim is defining the relevant

product and geographic markets." *Domed Stadium Hotel, Inc. v. Holiday Inns*, *Inc.*, 732 F.2d 480,

492 (5th Cir. 1984); *see also Brown Shoe*, 370 U.S. at 335 (1962) (noting that in a Section 7 case

"the proper definition of the market is a 'necessary predicate' to an examination of the competition

that may be affected by the horizontal aspects of the merger").

Although plaintiffs assert that the relevant product market as the market for "gasoline" and

the relevant geography as "the United States," Doc. 2 ¶¶ 40–41, they provide no further

explanation for why those are the correct markets or sufficient allegations to show how the

acquisition would lessen competition in those markets. Historically, when the FTC has reviewed

refinery acquisitions, it has looked at local markets.[6] Likewise, plaintiffs have failed to explain

---

[5] On the face of the complaint, the acquisition will lead to less market concentration, not more. Assuming that plaintiffs are correct in suggesting that PMI is, in effect, under the control of a foreign corporation, PEMEX, and assuming (incorrectly) that there is a "United States" gasoline market as Plaintiffs allege, then the sale by Shell will reduce the concentration in the United States refinery market given that neither PEMEX nor PMI are alleged to participate in that market (outside of PMI's participation in the joint venture).

[6] *See also,* Statement of the Federal Trade Commission Concerning Dismissal of the Administrative Complaint, *Paul L. Foster, Western Refining, Inc., and Giant Indus., Inc.* (Oct. 3, 2007), https://www.ftc.gov/system/files/documents/public_statements/568571/071003statement.pdf (assessing a local "Northern New Mexico bulk gasoline supply market"); Christopher T. Taylor & Daniel S. Hosken, *The Economic Effects of the Marathon - Ashland Joint Venture: The Importance of Industry Supply Shocks and Vertical Market Structure* (May 7, 2004), at 5–7, https://www.ftc.gov/sites/default/files/documents/reports/economic-effects-marathon-ashland-joint-venture-importance-industry-supply-shocks-and-vertical/wp270.pdf; FTC Staff Technical *Changes in the Petroleum Industry* (Dec. 21, 2004), at 6, 31–32,

why the market is not global, at least at the refinery level of distribution, given their allegations of potential exports to Mexico

The thrust of plaintiffs' complaint is that by allowing the acquisition, the Deer Park refinery's gasoline production will be exported to Mexico. First, they allege no facts supporting an agreement between defendants on this score, thus undercutting their suggestion that this is a *per se* claim. Moreover, this prediction about the future is highly speculative and itself compels dismissal. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (holding that a "highly attenuated chain of possibilities," involving "highly speculative fear" that third parties would take certain actions, did not amount to "certainly impending" injury for Article III standing); *In re Gee*, 941 F.3d 153, 163–65 (5th Cir. 2019).

Second, the complaint has no allegations to suggest that even if all the Deer Park refinery's gasoline were exported outside the United States, that would lead to undue concertation in the product market for gasoline or even to suggest whether that market is concentrated at all. There are no allegations about any other refiner's share of the gasoline market (which is traditionally how market concentration is measured)—the only allegation about gasoline production is that the Deer Park refinery can "sometimes" produce up to 2.5% of the gasoline refined in the United States on a given day. Nor are there any allegations about what portion of the refinery's gasoline is currently exported to Mexico—another fact that would be necessary to establish what effect increased exports might have on prices. Indeed, the complaint does not consider the most basic

---

https://www.ftc.gov/system/files/documents/reports/ftc-staff-technical-report-robustness-results-gaos-2004-report-concerning-price-effects-mergers/ftcstafftechnicalreport122104.pdf.   In fact, local laws and regulations may lead to the creation of localized markets. Statement of the Federal Trade Commission, *Sunoco Inc./Coastal Eagle Point Oil Co.* (Dec. 29, 2003), at 1–2, https://www.ftc.gov/sites/default/files/documents/cases/2003/12/031229stmt0310139.pdf (declining to challenge transaction involving "reformulated gasoline (RFG)" limited to Philadelphia area). Report, *Robustness of the Results in GAO's 2004 Report Concerning Price Effects of Mergers and Concentration*

and readily available federal data showing that today, gasoline is *both* imported into and exported from the United States, which shows the facile nature of any assertion that increased exports inevitably will drive up gasoline prices in the United States. *See* U.S. Energy Information Administration, *Petroleum & Other Liquids: Imports by Area of Entry* (Nov. 20, 2021), https://www.eia.gov/dnav/pet/pet_move_imp_dc_NUS-Z00_mbblpd_m.htm;   U.S.   Energy Information   Administration,   *Petroleum   &   Other   Liquids:   Exports*   (Nov.   30,   2021), https://www.eia.gov/dnav/pet/pet_move_exp_dc_NUS-Z00_mbblpd_m.htm.

There are also no allegations about whether there are other forces in the market that might temper prices, even if exporting more gasoline to Mexico might raise prices in the short term. For example, are there other gasoline refiners with excess refining capacity who could respond? Or are there already built, but idle, refineries that could be brought into service to meet demand for gasoline should additional exports to Mexico cause prices to rise? Could refiners switch from producing other products to producing gasoline for sale in the United States? Are there other exporters of gasoline who could pull back on exports to meet the alleged supply shortage that exporting more gasoline to Mexico from one refinery might cause? Nor is there any explanation why the Deer Park refinery, even after being acquired by PMI, would not pull back on such exports if it thought it might benefit from selling at higher prices in the United States. In assessing whether there is even the possibility of competitive harm from an acquisition or merger, the FTC has also considered whether regional refineries operate near capacity, *see* Statement of the Federal Trade Commission,   *Tesoro   Corp.   /   BP   p.l.c.*   (May   17,   2003),   at   1, https://www.ftc.gov/sites/default/files/documents/closing_letters/tesoro-corporation/bp-p.l.c./130517tesoro_bpstmtofcomm.pdf, or whether other firms could divert more supply to a

specific locality in response to price increases, *see* Statement of the Federal Trade Commission, *Sunoco*, at 2. Plaintiffs have made no allegations about any of these market factors.

It is also not clear that the geographic market for gasoline refining should be either as narrowly or broadly defined as plaintiffs have suggested. In the Fifth Circuit, defining a geographic market requires showing "not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir. 2002) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All.*, 123 F.3d 301, 311 (5th Cir. 1997)). The complaint has no allegations that explain why the market for gasoline is nationwide.

Without allegations properly defining the market and its structure, plaintiffs' complaint does not set out a prima facie case that PMI's acquisition of Shell's stake in the refinery could lessen competition in any market. Thus, plaintiffs fail to state a claim under Section 7.

**4.      Plaintiffs have failed to show they are appropriate plaintiffs.**

Apart from the other elements of antitrust standing, an antitrust plaintiff must show it is a proper plaintiff. In evaluating proper plaintiff status, the Fifth Circuit weighs: "(1) whether the plaintiff[']s injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007) (quoting *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988)). That plaintiffs do not allege they bought gasoline from the Deer Park refinery not only shows the speculative nature of their claim (as the distribution system for gasoline

in the United States makes it doubtful they did so),[7] but also shows that they are not the appropriate plaintiffs to challenge this transaction.

Because plaintiffs' alleged injuries and links to defendants are speculative, if there is any injury, the entities that bought from refineries would have been more directly harmed, and so allowing plaintiffs to proceed would risk multiple lawsuits if those direct purchasers choose to sue. As a result, plaintiffs are not the proper plaintiffs and lack antitrust standing. *See Associated Gen. Contractors*, 459 U.S. at 540–45; *McCormack*, 845 F.2d at 1341; *Cont'l Auto. Sys. v. Avanci, LLC*, 485 F. Supp. 3d 712, 731 (N.D. Tex. 2020); *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998, 1020 (S.D. Tex. 1997). Indeed, even if the transaction were anticompetitive and caused any injury—it is not and will not—upstream market participants, such as distributors or service station operators, are identifiable entities who would be more directly harmed and whose self-interest would motivate them to bring suit, meaning that the plaintiffs here are not proper plaintiffs. *Associated Gen. Contractors*, 459 U.S. at 542.

As a result, Plaintiffs cannot meet their burden to show that the requested "injunctive relief is necessary to prevent injury to its interests, rather than those of others" who more directly bear the alleged injury. *Garabet v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1170 (C.D. Cal. 2000).

---

[7] Plaintiffs' vague "gasoline" market does not distinguish between purchases by gasoline stations from refineries (or distributors) and purchases by consumers from gasoline stations. Even if plaintiffs bought gasoline, it would have been from one of many service stations in the United States who themselves might have, directly or indirectly, obtained gasoline from one or more refineries.

**5.      Plaintiffs' remaining allegations about anticompetitive effects are conclusory and insufficient to state a claim.**

Plaintiffs offer a hodgepodge of other allegations about the transaction's anticompetitive effects, but these are all conclusory and none establish that the transaction is likely to violate Section 7. Plaintiffs allege seven "anticompetitive effects" they contend the acquisition will cause:

> (1) gasoline produced at the Deer Park Refinery would be allocated to the Mexican market; (2) gasoline output to the United States market would be reduced; (3) rivals in the United States gasoline market will be prevented from obtaining gasoline from this refinery altogether; (4) rivals will be forestalled from acquiring the asset; (5) entry into the gasoline market will be more difficult since entrants will face the increased cost of building new refining facilities rather than acquiring existing refining capacity which is more affordable than new refinery construction; (6) the acquisition will increase the need for the imports of oil for gasoline production in the United States; and (7) prices for gasoline in the United States would increase.

Doc. 2 ¶ 43.[8] The complaint has no factual details to support any of these allegations. These conclusory assertions do not show how the acquisition will lead to concentration in the market or allege with any specificity the identity of the product and geographic markets. Nothing in these allegations makes it plausible that the acquisition will lessen competition or makes the likelihood of less competition probable or imminent.

The next problem with these allegations is that none show that (or how) the acquisition will lessen competition. Plaintiffs appear to allege the acquisition will be anticompetitive because there is or will be some form of a market-allocation agreement.[9] *See* Doc. 2 ¶¶ 13, 43, 47, 48. But

---

[8] The references to alleged, speculative harm to "rivals" and potential new "entrants" to the "gasoline" market in numbers 3–5 further emphasizes that these plaintiffs are not the appropriate plaintiffs here under the *Associated General Contractors* factors. Any purported harm is more directly felt, if at all, by other entities, further supporting a dismissal of this complaint.

[9] Plaintiffs do not assert a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, but if this market-allocation assertion tries to plead a Section 1 claim, it too fails. Section 1 prohibits only agreements that unreasonably restrain trade. Plaintiffs, however, offer no details to suggest that either defendant has agreed to allocate markets, to show who has agreed to allocate which markets, to show when or where or how this agreement was entered into, or to explain how the acquisition of a share in a lone refinery is relevant to or implicates such an agreement. Plaintiffs' nondescript allegation of a market-allocation agreement is

that is the extent of the allegation about a supposed market-allocation agreement. Plaintiffs do not explain what this agreement is; presumably, plaintiffs are assuming that the hypothetical exporting of more gasoline to Mexico means the Mexico market is being "allocated" to PMI. But absent any agreement with a competitor, any market actor is permitted under the law to deal (or not deal) with any customers of its choosing. *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal"). In any case, this allegation is so vague and conclusory that it is insufficient. And plaintiffs also do not explain why the Deer Park refinery would not be permitted to decide to export all its gasoline to Mexico today. In other words, plaintiffs fail to allege any facts to suggest that the acquisition would change the market dynamics that already exist—the refinery could (1) export all its gasoline to Mexico, (2) reduce its sales in  the United States, and (3) prevent rivals from obtaining gasoline from it altogether. Indeed, defendants are aware of no case that recognizes an increase in exports from the United States as anticompetitive conduct. Plaintiffs have therefore made only a vague and conclusory allegation of a market-allocation agreement that does not state a Section 7 claim.

Plaintiffs also claim that the acquisition will be anticompetitive because it will prevent rivals from acquiring the refinery and will make entering the market harder (presumably because any rivals that want to enter the market would need to build their own refinery rather than buy the one in Deer Park or any of the many other refineries in the United States). But plaintiffs do not identify other entrants to the market, explain how this acquisition prevents them from later

---

therefore conclusory and does not state a Section 1 claim or require applying the *per se* rule. *Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality" for a claim under Section 1 of the Sherman Act.).

acquiring this (or any other) refinery themselves, explain why any rival has a right to acquire this one refinery so that it can more easily enter the market, or explain why PMI's acquisition of the refinery would be anticompetitive but a rival's acquisition of the same refinery would not be. Apart from showing that these are not the appropriate plaintiffs here, *see supra* note 8, these allegations are pure speculation and do not plausibly show that this acquisition will lessen competition.

Lastly, plaintiffs claim that the acquisition will be anticompetitive because it will increase the need for oil imports and will increase gasoline prices. As explained above, the allegation that this acquisition will have the secondary or tertiary effect of increasing gasoline prices anywhere, let alone throughout the United States, is speculative. And plaintiffs offer no further details to explain how this one transaction involving, at most, 2.5% of daily refined gasoline production in the United States will increase the United States' need for oil imports. The allegation is conclusory, and thus it is also insufficient.

Plaintiffs' claims are a collection of speculative and conclusory allegations with no details that might make those allegations plausible. *Twombly*, 550 U.S. at 555–56; *Iqbal*, 556 U.S. at 678. Because plaintiffs have not pleaded a sufficient market definition and have not plausibly alleged that the acquisition will lead to market concentration or will otherwise lessen competition, plaintiffs have failed to state an antitrust claim. Thus, the complaint should be dismissed.

**6.     Granting plaintiffs the extreme and belated injunctive relief that they seek would be inequitable.**

Section 16 of the Clayton Act allows private plaintiffs to seek injunctive relief for a violation of the Clayton Act, including Section 7, "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings." 15 U.S.C. § 26. Courts apply general principles of equity to determine whether equitable relief is appropriate for a violation of

Section 7. *See California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). Still, injunctions are "extraordinary remedies," and "[t]he Supreme Court has recognized the danger in granting injunctive relief to parties who are not injured by a merger." *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 102 (5th Cir. 1992). Thus, "[a] party seeking an injunction must also plead and prove an irreparable injury for which no adequate remedy at law exists." *Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759, 767 (S.D. Tex. 2007) (Rosenthal, J.).

Here, plaintiffs' delay in seeking relief is grounds for dismissing their claims as it shows that any harm they might suffer is not irreparable.

PMI's acquisition of the Deer Park refinery was announced in May 2021. Doc. ¶ 42. That deal is worth over a half-billion dollars. Rather than sue shortly after the transaction was announced, Plaintiffs waited almost eight months, until December 16, 2021, to bring their claims.

Courts have dismissed claims for injunctive relief where plaintiffs have been dilatory in challenging mergers. In *Ginsburg v. InBev NV/SA*, the plaintiffs waited nearly two months after a multi-billion-dollar merger was announced to sue. 623 F.3d 1229, 1231 (8th Cir. 2010). They then failed to seek injunctive relief until only a few weeks before the transaction was set to close. *Id.* The district court granted judgment for the defendants on the pleadings. The Eighth Circuit held that, for a transaction of that size, the plaintiffs' delay in seeking relief was "inexcusable." *Id.* at 1235. The court also noted that the government had the same information as the plaintiffs yet chose not to challenge the merger. *Id.* Because of the plaintiffs' delay, their requested injunctive relief would impose an "obvious hardship" on the defendants while preventing an antitrust injury that was only "speculative and localized." *Id.* at 1235–36. In affirming dismissal of the claims on the pleadings, the court held that injunctive relief was barred. *Id.* at 1236.

21

Plaintiffs' delay here in suing to challenge such a large deal—on the eve of closing and right before the holidays—is inexcusable. This delay is almost four times as long as the delay that the Eighth Circuit found "inexcusable" in *Ginsburg*. And like in *Ginsburg*, the hardship that halting such a large deal so late would impose on defendants outweighs the speculative benefit it would grant plaintiffs. Here, too, the government has been in full possession of all the facts about the acquisition and has permitted it to go forward. Plaintiffs' remedy should likewise be barred.

Stopping the deal this late is little different than unwinding after it is formally closed.. Obviously, in seeking to close the deal, defendants have been working for nearly eight months and are near completion. Closing a deal of this size, and making the necessary corporate and operational changes to carry it out, takes significant time, effort, and money. All of which would be for nothing if defendants are forced to stop and unwind the deal now. The relief plaintiffs seek would create obvious hardships for defendants, and defendants would have to shoulder these hardships to prevent speculative injuries for a few remote buyers of gasoline with no clear connection to this acquisition. Granting plaintiffs their requested relief would thus be inequitable. *See id.* at 1235–36 (noting that, because forced divestiture would cause an "obvious hardship" for the defendants and the plaintiffs' alleged antitrust injury was only speculative, "the remedial equities balance overwhelmingly in favor of denying this remedy").

This threadbare complaint could have easily been filed days after the deal was announced. But plaintiffs waited. They have had eight months to prepare a coherent challenge to this deal, yet have mustered only nine pages of conclusory and speculative allegations. Nothing in plaintiffs' complaint excuses their dilatory tactics. Halting a half-billion-dollar deal in Texas for a small laundromat and its two owners in New York who waited to sue until the deal was almost done and who assert hypothetical, remote, and speculative injuries would be an inequitable remedy. *See*

*Broadcom, Inc. v. Qualcomm Inc.*, 501 F.3d 297, 322 (3d Cir. 2007) ("Hypothetical anticompetitive conduct, speculative monopoly power, and remote injuries do not merit the extreme remedy of divestiture."). Plaintiffs' half-hearted, eleventh-hour attempt to stop this deal should fail.

## CONCLUSION

Plaintiffs' complaint should be dismissed with prejudice under Rule 12(b)(1) and Rule 12(b)(6). Plaintiffs' lack of standing under Article III and the antitrust laws, as well as the lack of antitrust injury, means that any attempt to amend would be futile, and claims should be dismissed with prejudice when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000) (quoting *Shipp v. McMahon*, 199 F.3d 256, 260 (5th Cir. 2000)).

Dated: December 29, 2021

Respectfully submitted,

**OF COUNSEL:**

NORTON ROSE FULBRIGHT US LLP
Carlos R. Rainer
State Bar No. 24027641
carlos.rainer@nortonrosefulbright.com
Anne M. Rodgers
State Bar No. 17133025
anne.rodgers@nortonrosefulbright.com
Eliot Turner
State Bar No. 24066224
eliot.turner@nortonrosefulbright.com
Luke Schamel
State Bar No. 24106403
luke.schamel@nortonrosefulbright.com

**OF COUNSEL**

WINSTON & STRAWN LLP
Aldo A. Badini*
abadini@winston.com
Marcelo M. Blackburn*
mblackburn@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700

*Pro hac vice application forthcoming*

_/s/ Layne E. Kruse_

    Layne E. Kruse
    State Bar No. 11742550
    Federal ID No. 2383
    layne.kruse@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246

*Attorney-in-Charge for Defendants Shell Oil Company and Deer Park Refining Limited Partnership*

_/s/ Michael T. Murphy_

    Michael T. Murphy
    State Bar No. 24051098
    Federal ID No. 621098
    mtmurphy@winston.com
800 Capitol St., Suite 2400
Houston, TX 77002
Telephone: (713) 651-2600
Facsimile:    [Fax]

*Attorney-in-Charge for PMI Service North America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2021, I electronically transmitted this document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

/s/ Eliot F. Turner
Eliot F. Turner

*Counsel for Defendants Shell Oil Company and Deer Park Refining Limited Partnership*