**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **Aaron Hagele, Andrew Sarcinella, Jr., and AASH Services, LLC,** | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action   No. 4:21-cv-04103 |
| **Shell Oil Company, PMI Service North America Inc., and Deer Park Refining Limited Partnership**, | § § § | |
| *Defendants*. | § § § | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
APPLICATION FOR EITHER A TEMPORARY RESTRAINING ORDER
OR PRELIMINARY INJUNCTIVE RELIEF**

Michael T. Murphy
Winston & Strawn LLP
800 Capitol St., Suite 2400
Houston, TX 77002
Telephone: (713) 651-2600

Aldo A. Badini
Marcelo M. Blackburn
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700

*Attorneys for Defendant PMI Services North America, Inc.*

Layne E. Kruse
Carlos R. Rainer
Anne M. Rodgers
Eliot F. Turner
Luke A. Schamel
Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151

*Attorneys for Defendants Shell Oil Company and Deer Park Refining Limited Partnership*

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ................................................................ 2

SUMMARY OF ARGUMENT ................................................................ 4

STANDARD FOR OBTAINING INJUNCTIVE RELIEF ................................................................ 5

ARGUMENT AND AUTHORITIES ................................................................ 7

1.    Plaintiffs cannot show a substantial likelihood of success because they lack standing and have not pleaded a viable antitrust claim ................................................................ 7

2.    Plaintiffs cannot show that they will suffer any immediate or irreparable injury absent injunctive relief. ................................................................ 13

3.    The harm an injunction would cause to defendants outweighs the speculative harm an injunction might somehow prevent. ................................................................ 17

4.    Plaintiffs fail to show that the proposed injunction will not disserve the public interest. ................................................................ 20

5.    Plaintiffs' defective verifications preclude relief under Rule 65. ................................................................ 21

6.    Plaintiffs' failure to indicate their willingness or capability to post security for costs due to any injunctive relief compels denial. ................................................................ 22

CONCLUSION ................................................................ 24

CERTIFICATE OF SERVICE ................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Telnet, Inc. v. GTE Corp.*,
  No. CIV.A.3:99CV0280D, 1999 WL 242686 (N.D. Tex. Apr. 16, 1999) .......................15, 16

*Anyadike v. Vernon College*,
  No. 7:15-CV-00157-O, 2016 WL 107901 (N.D. Tex. Jan. 11. 2016)....................................17

*Ball Mem'l Hosp. v. Mut. Hosp. Ins., Inc.*,
  784 F.2d 1325 (7th Cir. 1986) (Easterbrook, J.)....................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................................12

*Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co.*,
  550 F.2d 189 (4th Cir. 1977) ..................................................................................................8

*Bluefield Water Ass'n, Inc. v. City of Starkville*,
  577 F.3d 250 (5th Cir. 2009) .................................................................................................21

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)...............................................................................................................10

*Bryum v. Landreth*,
  566 F.3d 442 (5th Cir. 2009) ...................................................................................................5

*Burgess v. FDIC*,
  871 F.3d 297 (5th Cir. 2017) .................................................................................................16

*Canal Auth. of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) ...................................................................................................5

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) .................................................................................................6

*Chi. Bridge & Iron Co. N.V. v. Fed. Trade Comm'n*,
  534 F.3d 410 (5th Cir. 2008) ...................................................................................................9

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Auth.*,
  636 F.2d 1084 (5th Cir. Unit B Feb. 1981)...........................................................................23

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...............................................................................................................14

*Cook v. City of Dallas*,
   3:12-CV-03788-P, 2012 WL 13191445 (N.D. Tex. Nov. 9, 2012) .......................................7

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.*,
   901 F.2d 1267 (5th Cir. 1990) .......................................................................................15, 16

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
   732 F.2d 480 (5th Cir. 1984) ...............................................................................................10

*E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*,
   357 F.3d 1 (1st Cir. 2004) .......................................................................................................6

*Enter. Int'l Corp. v. Corporacion Estatal Petrolera Ecuatoriana*,
   762 F.2d 464 (5th Cir. 1985) ..................................................................................................6

*Expedi, Inc. v. Rebound Int'l, LLC.*,
   No. 4:20-CV-3897, 2021 WL 3702169 (S.D. Tex. May 13, 2021) .......................................17

*Fed. Trade Comm'n v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) ................................................................................................9

*Franciscan All., Inc. v. Burwell*,
   227 F. Supp. 3d 660 (N.D. Tex. 2016) .................................................................................23

*Gebhart Eur. Autos, LLC v. Porsche Cars of N. Am., Inc.*,
   No. 10–CV–02696–MSK, 2010 WL 4642490 (D. Colo. Nov. 9, 2010) ...............................22

*Glycobiosciences, Inc. v. Woodfield Pharm., LLC*,
   No. 4:15-CV-02109, 2016 WL 1702674 (S.D. Tex. Apr. 27, 2016) .....................................23

*Greenway v. Wilkie*,
   No. H-18-3776, 2018 WL 5921224 (S.D. Tex. Nov. 13, 2018) (Rosenthal, J.)..................6, 7

*Hardin v. Hous. Chron. Publ'g Co.*,
   426 F. Supp. 1114 (S.D. Tex. 1977) ....................................................................................16

*Hassani v. Napolitano*,
   No. 3:09-CV-1201-D, 2009 WL 2044596 (N.D. Tex. July 15, 2009) .....................................6

*Holland Am. Ins. Co. v. Succession of Roy*,
   777 F.2d 992 (5th Cir. 1985) .........................................................................................13, 15

*Jackson Women's Health Org. v. Currier*,
   760 F.3d 448 (5th Cir. 2014) ..................................................................................................6

*Johnson Controls, Inc. v. Guidry*,
   724 F. Supp. 2d 612 (W.D. La. 2010).................................................................................15

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ............................................................................12

*Lewis v. S.S. Baune*,
    534 F.2d 1115 (5th Cir. 1976) ............................................................................13

*Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*,
    446 F.2d 353 (5th Cir. 1971) ..............................................................................22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................................4

*In re Microsoft Corp.*,
    333 F.3d 517 (4th Cir. 2003) ..............................................................................13

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)............................................................................................12

*Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.*,
    913 F. Supp. 1088 (N.D. Ill. 1995) ....................................................................10

*Nichols v. Alcatel USA, Inc.*,
    532 F.3d 364 (5th Cir. 2008) ........................................................................13, 23

*Nirvana, Inc. v. Nestle Waters N. Am., Inc.*,
    123 F. Supp. 3d 357 (N.D.N.Y. 2015)................................................................16

*OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*,
    No. 4:16-CV-350, 2016 WL 3747222 (E.D. Tex. July 13, 2016) ..........................6

*Parks v. Dunlop*,
    517 F.2d 785 (5th Cir. 1975) ........................................................................14, 16

*In re Propranolol Antitrust Litig.*,
    249 F. Supp. 3d 712 (S.D.N.Y. 2017).................................................................16

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
    60 F. Supp. 2d 502 (M.D.N.C. 1999) ...................................................................8

*R.S. v. Bd. of Educ. Shenendehowa Cent. Sch. Dist.*,
    No. 1:17-CV-501, 2017 WL 3382159 (N.D.N.Y. Aug. 7, 2017)...........................14

*Real Truth About Obama, Inc. v. FEC*,
    575 F.3d 342 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S.
    1089 (2010).............................................................................................................8

*Rodriguez v. United States*,
    66 F.3d 95 (5th Cir. 1995) .....................................................................................8

*Sahara Health Care, Inc. v. Azar*,
    349 F. Supp. 3d 555 (S.D. Tex. 2018), *aff'd*, 975 F.3d 523 (5th Cir. 2020) ............................8

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
    632 F.3d 938 (5th Cir. 2011) ..........................................................................................20, 21

*Stone Metals Am., LLC v. Eubank*,
    No. 3:20-CV-0253-K, 2020 WL 570906 (N.D. Tex. Feb. 5, 2020) ......................................22

*Theatre Enters., Inc. v. Paramount Film Dist. Corp.*,
    346 U.S. 537 (1954)..............................................................................................................12

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021).............................................................................................................7

*United States v. Emerson*,
    270 F.3d 203 (5th Cir. 2001) ................................................................................................13

*United States v. Phila. Natl. Bank*,
    374 U.S. 321 (1963)................................................................................................................9

*Victus, Ltd. v. Collezione Europa U.S.A., Inc.*,
    26 F. Supp. 2d 772 (M.D.N.C. 1998) ...................................................................................10

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)....................................................................................................................8

## Rules and Statutes

15 U.S.C. § 18........................................................................................................................9

15 U.S.C. § 26...........................................................................................................2, 3, 13, 22

28 U.S.C. § 1746.....................................................................................................................21

Fed. R. Civ. P. 10.....................................................................................................................1

Fed. R. Civ. P. 12.....................................................................................................................1

Fed. R. Civ. P. 65.............................................................................................................21, 22

N.Y. Gen. Bus. Law § 340......................................................................................................16

## Other Authorities

U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER
    GUIDELINES 18 (2010), *available at*
    https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-
    2010.pdf .........................................................................................................................9, 10

The United States-Mexico-Canada Agreement, U.S.-Mex.-Can., *agreed to* Oct. 1,
    2018, *available at* https://ustr.gov/trade-agreements/free-trade-
    agreements/united-states-mexico-canada-agreement/agreement-between ............................20

Defendants Shell Oil Company (Shell), PMI Services North American Inc. (PMI), and Deer Park Refining Limited Partnership oppose the request of plaintiffs Aaron Hagele, Andrew Sarcinella, Jr., and AASH Services, LLC, for either a temporary restraining order (TRO) or preliminary injunctive relief. Indeed, the Court can determine that plaintiffs lack standing to request any relief whatsoever and have failed to state a claim on the merits and, then, dismiss this case with prejudice.[1]

Since the early 1990s, Shell and PMI have operated a refinery through their joint venture, the Deer Park Refining Limited Partnership. Ex. A, https://www.shell.us/about-us/projects-and-locations/deer-park-manufacturing-site/about-shell-deer-park.html. Shell has a 50.005% interest in the joint venture, and PMI has the remaining 49.995%. Ex. B, Declaration of Kristen Bergeron, ¶ 2. The refinery produces many products, including gasoline, aviation fuels, diesel fuels, ship fuel, and petroleum coke. *Id.* ¶ 3.

On May 24, 2021, Shell and PMI publicly announced that Shell would sell its interest in the joint venture to PMI, in a transaction worth $596 million (plus other consideration for hydrocarbon inventories). *Id.* ¶ 4. Because the refinery is heavily interconnected with Shell's adjoining, 100%-owned chemical plant, Shell immediately started work—budgeted at $30 million—to separate the operations of the two facilities. PMI also began work preparing for the transaction and has incurred significant transaction costs. Ex. C, Declaration of Manuel Flores Camacho ¶ 4. Once the transaction closes, PMI will be the sole owner of the refinery.

Eight months after the transaction was announced, two New Yorkers and the coin-operated laundromat they own, sued. Although the Federal Trade Commission (FTC) long before had

---

[1] Defendants have moved to dismiss under Rules 12(b)(1) and 12(b)(6), which defendants adopt and incorporate by reference under Rule 10(c). *See* Doc. 20.

declined to act to stop the transaction for any anticompetitive concerns, plaintiffs sued on the eve of closing and during the winter holidays, claiming they needed immediate relief from this Court to stop a-half-a-billion dollar transaction. Defendants have invested considerable time and expense in preparing to transfer Shell's interest to PMI. Defendants received the final governmental approval required on December 21 and are ready to close this deal promptly. Ex. D, CFIUS Letter. The Court should not allow plaintiffs' eleventh-hour effort to derail a long-planned transaction that could have no anticompetitive effect on retail gasoline prices.

If the Court does not dismiss this case before the January 6, 2022 hearing, then defendants request that the Court combine its consideration of plaintiffs' request for a TRO with a preliminary injunction at the hearing, so that any cloud over the pre-closing preparations can be removed as early as possible to relieve the inequitable uncertainty that plaintiffs have created for defendants and hundreds of their employees at the refinery.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs sued on December 16, 2021, asking this Court to prevent Shell and PMI from consummating the sale of Shell's 50.005% interest in the Deer Park Refining Limited Partnership to PMI. Plaintiffs contend the transaction violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and they seek temporary and permanent injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Plaintiffs do not seek money damages.

The transaction was announced almost eight months before plaintiffs sued. *See* Doc. 2 ¶ 6 ("On or about May 24, 2021, PMI's intention to acquire control of the Deer Park Refinery was announced."); *see also* Ex. E, "Shell to sell interest in Deer Park refinery to partner Pemex," https://www.shell.com/media/news-and-media-releases/2021/shell-to-sell-interest-in-deer-park-refinery-to-partner-pemex.html. Clayton Act Section 16 requires "a showing that the danger of irreparable loss or damage is immediate" for a preliminary injunction to issue. 15 U.S.C. § 26.

Plaintiffs have tried to manufacture an air of immediacy by waiting until the last minute to sue (when the pressure on defendants would also be maximized). But while plaintiffs contend in their TRO application that they "recently learned of this deal," they provide no underlying facts of how or when they did learn of the deal or even why that should matter given the public announcement of the deal in May 2021.

A key inquiry under Section 16 is whether plaintiffs can show imminent "irreparable loss or damage" from the transaction. *Id.* Here, however, plaintiffs cannot point to any irreparable loss or competitive harm – imminent or otherwise. The FTC and the Committee on Foreign Investment in the United States (CFIUS) each reviewed this transaction for any competitive, economic, and national security impacts. Both agencies allowed the transaction to proceed unchallenged and without conditions. *See* Ex. F, Declaration of John R. Dierking (explaining FTC review procedure for the transaction); Ex. B, Bergeron Dec. ¶¶ 12–13 & Ex. B (explaining CFIUS review notification and attaching December 21, 2021 letter from CFIUS explaining that upon its "review and investigation, and after full consideration of all relevant national security factors . . . , CFIUS has determined that there are no unresolved national security concerns").

In contrast, delaying the transaction (which defendants plan to close as soon as possible this month), Ex. B, Bergeron Dec. ¶ 11, by even a week or two will impose significant costs on defendants, including depriving them of the benefit of their bargain. Ex. C, Flores Camacho Dec. ¶ 6.

Defendants, therefore, ask this Court to combine the TRO with consideration of a preliminary injunction and to deny plaintiffs' request for any injunctive relief. As explained below, there is no need for plaintiffs to conduct discovery (either now or ever), which will only be used as another tool to delay and injure defendants. Merely claiming that in the future Plaintiffs may

demand a preliminary injunction does not unlock the doors of discovery. Plaintiffs lack standing; they have not pleaded an antitrust case; nor can they show irreparable harm.

## SUMMARY OF ARGUMENT

Plaintiffs are asking this Court to stop a significant acquisition involving long-time joint venture partners on little more than their own say-so. Their request should be denied.

*First*, as defendants demonstrated in their motion to dismiss, plaintiffs' claims fail at the outset because they lack standing to sue under Article III or the antitrust laws and they have not alleged legally viable claims. Indeed, plaintiffs offer no evidence suggesting that the transaction would violate Section 7. Their assertion that exports from a single refinery, which they admit supplies no more than 2.5% of the gasoline produced in the United States, somehow would raise U.S. gasoline prices ignores that competing refineries could immediately respond by increasing output or reducing their own exports to benefit from those prices (thereby increasing supply and bringing prices down again) and that, similarly, imports of gasoline to the United States would likely increase in response to higher prices (also increasing supply and bringing prices down again). In addition, there is no evidence that the transaction is the cause of any claimed injury, as nothing prevents Deer Park's co-owners from increasing gasoline exports to Mexico today. Nor have plaintiffs alleged (or provided) any facts that would support their conclusory assertion that defendants have agreed to allocate markets. Indeed, it is completely implausible that Shell and PMI would try to carry out a market allocation scheme through a publicly announced transaction that was subject to review by multiple federal agencies, including the FTC. In sum, plaintiffs' speculative allegations of an antitrust violation make no economic sense, which shows that they have no likelihood of prevailing on the merits, and strongly cautions against granting the relief they request. *Cf. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97

(1986) (lack of rational motive to conspire required summary judgment on plaintiffs' antitrust claims).

*Second*, plaintiffs, who waited until the eve of the transaction's closing to sue, do not allege facts to show that they will suffer either immediate or irreparable harm without injunctive relief.

*Third*, the millions of dollars of concrete harm an injunction would cause defendants outweighs the speculative harm of denying an injunction to plaintiffs.

*Fourth*, plaintiffs fail to show that the proposed injunction will serve the public interest, since, among other things, enjoining exports to Mexico from a single refinery conflicts with recent free trade agreements between with United States and Mexico, which try to promote trade between the two countries. Plaintiffs' failure to meet any one of those four requirements dooms their request for injunctive relief.

Finally, on top of those deficiencies, plaintiffs' request for injunctive relief should also be denied because their verifications are defective under Rule 65, and they have shown no willingness or any capability to post the security for costs required under Rule 65 and Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin a nearly $600 million transaction.

## STANDARD FOR OBTAINING INJUNCTIVE RELIEF

Plaintiffs do not and cannot satisfy the stringent requirements for obtaining the extraordinary remedy of injunctive relief—the sole relief they request.

"[A] preliminary injunction is an extraordinary and drastic remedy. . . ." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *accord Bryum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). "To obtain a temporary restraining order or a preliminary injunction, the moving party must demonstrate: '(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the

threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.'" *Greenway v. Wilkie*, No. H-18-3776, 2018 WL 5921224, at *2 (S.D. Tex. Nov. 13, 2018) (Rosenthal, J.) (quoting *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014)). This is because "[a] TRO is simply a highly accelerated and temporary form of preliminary injunctive relief." *Hassani v. Napolitano*, No. 3:09-CV-1201-D, 2009 WL 2044596, at *1 (N.D. Tex. July 15, 2009). If the party fails to carry the burden of meeting even one of the requirements, it is not entitled to obtain injunctive relief. *Enter. Int'l Corp. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

Plaintiffs cannot minimize their burden by claiming that they only want a TRO. And for that reason, based on the harm defendants would suffer from any further delay, *see* Ex B, Bergeron Dec.¶ 8, Ex. C, Flores Camacho Dec. ¶¶ 5-10, defendants ask that the Court consolidate any TRO hearing with a preliminary injunction hearing. Given the overlap in a plaintiff's burden and the need for a prompt resolution of this matter, plaintiffs' arguments and evidence, if any, can be heard in one hearing as a matter of judicial economy and to minimize harm to defendants. Because plaintiffs' complaint does not state a claim—there is no need for the Court to defer consideration of these issues until after discovery, given that plaintiffs should not be entitled to any discovery in the first place.[2] It is no answer that plaintiffs have sought an injunction and need discovery. *See also OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*, No. 4:16-CV-350, 2016 WL 3747222,

---

[2] *See, e.g.*, *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) ("When the requisite elements [of a claim] are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."); *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*, 357 F.3d 1, 9 (1st Cir. 2004) ("[T]he cases also say that it is not enough to merely allege a violation in conclusory terms, that the complaint must make out the rudiments of a valid claim, and that discovery is not for fishing expeditions.").

at *5 (E.D. Tex. July 13, 2016) (denying motion for expedited discovery and recognizing that "expedited discovery is not automatically granted merely because a party seeks a preliminary injunction."). Any standard for expedited discovery requires a plaintiff to show "more than fears and bare accusations." *Cook v. City of Dallas*, 3:12-CV-03788-P, 2012 WL 13191445, at *2 (N.D. Tex. Nov. 9, 2012). But that is all plaintiffs offer.

## ARGUMENT AND AUTHORITIES

1. **Plaintiffs cannot show a substantial likelihood of success because they lack standing and have not pleaded a viable antitrust claim.**

Plaintiffs' motion fails at the outset because, as explained in defendants' motion to dismiss, they do not have Article III standing or standing to sue for injunctive relief under Section 16 of the Clayton Act. 15 U.S.C. § 26.[3] Without a clear demonstration of standing, injunctive relief cannot be granted. *E.g.*, *Greenway*, 2018 WL 5921224, at *3 (denying application for TRO or preliminary injunction where no evidence supported plaintiffs' theory of recovery and it was unclear whether plaintiffs had "standing to raise this argument"). None of plaintiffs here can meet their burden of proving Article III or antitrust standing.

Plaintiffs have suggested that they have standing because of *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). They are wrong. *TransUnion* is not an antitrust case, and there, the Court found that consumers whose credit reports had wrongly identified them as being on government watch lists, had not suffered an injury-in-fact where those reports had not been shared with third parties. The Court found that even if a risk of future harm *could* confer standing for these

---

[3] As noted above, defendants incorporate the arguments in their motion to dismiss under Rules 12(b)(1) and 12(b)(6), where defendants show that plaintiffs have not alleged facts establishing standing or any likelihood of success on the merits of their claim under Clayton Act Section 7, 15 U.S.C. § 18. *See* Doc. 20.

consumers, they had not "establish[ed] a sufficient risk of future harm to support Article III standing" because the alleged harm was "too speculative." *Id.* at 2212. The same is true here.

Even if they had standing, plaintiffs' failure to state a claim on the merits, as detailed in defendants' motion to dismiss. This failure likewise mandates that their request for injunctive relief be denied. This Court has explained that a failure to state a claim prevents a plaintiff from establishing a likelihood of success on the merits for injunctive purposes. *Sahara Health Care, Inc. v. Azar*, 349 F. Supp. 3d 555, 579 (S.D. Tex. 2018), *aff'd*, 975 F.3d 523 (5th Cir. 2020) ("Sahara fails to state a claim for ultra vires actions. The district court did not err by denying injunctive relief on that ground."); *see also Rodriguez v. United States*, 66 F.3d 95, 97 (5th Cir. 1995) (where a complaint does not establish success on the merits, a court "need not consider the remaining requirements for obtaining injunctive relief").

Plaintiffs also claim that they "need not show a strong likelihood of success on the merits" as long as they "can show that the balance of equities tips sharply in their favor," quoting an out-of-circuit district court case. Doc. 15 at 9 (quoting *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 60 F. Supp. 2d 502, 509 (M.D.N.C. 1999)). But plaintiffs are citing bad law. *R.J. Reynolds* was applying the Fourth Circuit's balance-of-hardship test from *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977). *R.J. Reynolds*, 60 F. Supp. 2d at 508–09. The Fourth Circuit abrogated that test over a decade ago because it conflicted with *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). *See Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010) ("[T]he *Blackwelder* balance-of-hardship test may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit . . . .") Thus, plaintiffs' cited authority fails to support avoiding the requirement of showing a likelihood of success.

In any case, plaintiffs' motion also shows that they are unlikely to prevail on the merits. Section 7 requires that a plaintiff show a transaction is likely to *substantially* lessen competition or tend to create monopoly. 15 U.S.C. § 18. The typical way a plaintiff establishes that is by "showing that the transaction in question will significantly increase market concentration." *Chi. Bridge & Iron Co. N.V. v. Fed. Trade Comm'n*, 534 F.3d 410, 423 (5th Cir. 2008). Put another way, would the proposed transaction "produce 'a firm controlling an undue percentage share of the relevant market and . . . result[] in a significant increase in the concentration of firms in the market.'" *Fed. Trade Comm'n v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001) (quoting *United States v. Phila. Natl. Bank*, 374 U.S. 321, 363 (1963)). To measure the increase in concentration an acquisition produces, courts and antitrust enforcers typically look to the market shares of each party to the transaction and what those shares will be following the transaction. *See, e.g.*, *id.*; U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES 18 (2010) [hereinafter 2010 GUIDELINES] ("Market concentration is often one useful indicator of likely competitive effects of a merger. In evaluating market concentration, the Agencies consider both the post-merger level of market concentration and the change in concentration resulting from a merger."), *available at* https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf.[4]

The complaint has no allegations about the market shares of either Shell or PMI, or any other participants in the market. Thus plaintiffs have presented no evidence about whether the market is concentrated to begin with or whether the transaction would increase market

---

[4] The antitrust agencies often use the Herfindahl-Hirschman Index (HHI) to calculate market concentration. 2010 GUIDELINES at 18–19. HHI is calculated by adding up the "squares" of the market shares of each firm in a relevant market. *Id.* at 18. Depending on the results of that exercise, a market may be "unconcentrated," "moderately concentrated," or "highly concentrated." *Id.* at 19.

concentration. Indeed, the transaction appears to *lessen* rather than *increase* concentration, as it will reduce Shell's market share and, other than through its participation in the joint venture, PMI does not have other refining operations in the United States. *See* Ex. G, Declaration of Ramsey Shehadeh, Ph.D, ¶ 37. When a transaction increases market concentration by "less than 100 points," as is the case here since the transaction lessens concentration, it is "unlikely to have adverse competitive effects and ordinarily require[s] no further analysis." 2010 GUIDELINES at 19.

Plaintiffs also fail to allege or provide any evidence that the transaction is likely to increase gasoline prices.[5] They have alleged no facts about the relevant markets, which are necessary to evaluate their likelihood of success, and which, when considered, show that their conclusion is highly implausible. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491 (5th Cir. 1984) ("[T]he first step in analyzing a section seven claim is defining the relevant product and geographic markets"). Indeed, the Supreme Court has emphasized that, besides statistics about market share, "only a further examination of the particular market—its structure, history, and probable future—can provide the appropriate setting for judging the probably anticompetitive effect of the merger." *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 n.38 (1962). Once again, plaintiffs provide no details about the structure or dynamics of the market for refinery output or how that market relates to the market for retail gasoline. Ex. G, Shehadeh Dec. ¶¶ 38-44, Rather than drawing on the structure and economics of either the refining or retail markets to elaborate a theory of harm, plaintiffs simply assert, that since PMI intends to export gasoline from the Deer

---

[5] Nor do plaintiffs offer any independent expert opinion to support their claims, which should be fatal based on the complaint's conclusory allegations. *See, e.g.*, *Victus, Ltd. v. Collezione Europa U.S.A., Inc.*, 26 F. Supp. 2d 772, 777–78 (M.D.N.C. 1998) (although expert testimony is not always required, the plaintiff's antitrust claim was implausible without it); *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.*, 913 F. Supp. 1088, 1101 n.11 (N.D. Ill. 1995) (plaintiff has the "burden of proving anticompetitive impact to the finder of fact through market analysis *by an expert economist*" (emphasis added)).

Park refinery to Mexico after the closing, it must follow that gasoline prices in the United States will increase. Doc. 2 ¶¶ 13, 43; Doc. 15 at 12 n.5.[6] But plaintiffs do not provide any economic analysis to show that increasing exports from the Deer Park refinery, which even they concede can only produce 2.5% of gasoline refined in the United States, and which in fact, produces less, Ex. G, Shehadeh Dec. ¶¶ 24–25, would increase gasoline prices in the United States. *Id.* ¶ 26. For example, plaintiffs also do not explain why increased exports from the Deer Park refinery are not simply displacing exports to Mexico from other U.S. refineries. *Id.* ¶ 26. In other words, even if gasoline exports to Mexico from the Deer Park refinery increase, it does not necessarily follow that overall exports to Mexico will increase as a result.

Nor do plaintiffs consider the ability of other firms to respond to price increases—a key factor in determining whether a reduction in supply from the Deer Park refinery would, in fact, lead to higher prices. *See, e.g.*, *Ball Mem'l Hosp. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986) (Easterbrook, J.) ("In other cases, however, a firm's share of current sales does not reflect an ability to reduce the total output in the market, and therefore it does not convey power over price. Other firms may be able, for example, to divert production into the market from outside. They may be able to convert other productive capacity to the product in question or import the product from out of the area. If firms are able to enter, expand, or import sufficiently quickly, that may counteract a reduction in output by existing firms.").

Here, the ability of other firms to respond would offset the price increases plaintiffs assert will occur if PMI exports more gasoline from Deer Park to Mexico. For example, U.S. refiners

---

[6] Plaintiffs provide a hyperlink to a press conference given by Mexican president, Andres Manuel Lopez Obrador. Defendants have attached an official translation of the press conference along with translated versions of the slides presented at the conference. *See* Ex. H, Declaration of Marcelo Blackburn.

already export a great deal of gasoline from the Gulf Coast. Ex. G, Shehadeh Dec. ¶ 27. If prices in the United States were to increase, firms could pull back on exports from the United States to profit from increased U.S. prices, which would offset any price increase. *Id.* ¶ 28. Increased imports to the United States would also offset price increases, but again plaintiffs address none of these issues in their complaint or motion. *Id.* ¶ 30. Finally, plaintiffs fail to address that the other 122 refineries in the United States could increase gasoline production and offset the effect any increased exports might have. *Id.* ¶ 32. In short, plaintiffs not only fail to allege any facts or provide any evidence that the transaction will have likely anticompetitive effects, economic theory and the evidence about the market undercuts their assertion that increased exports from Deer Park will lead to permanently higher gasoline prices in the United States.

Nor, as plaintiffs claim, is a decision by PMI to export gasoline to Mexico, even if proven to be true, a "market allocation agreement." To begin with, plaintiffs have not alleged plausible facts suggesting that Shell and PMI agreed to allocate markets. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("[A] § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (concluding allegation of Section 1 violation insufficient where plaintiffs failed to "answer the basic questions: who, did what, to whom (or with whom), where and when?").[7] Plaintiffs cite no facts suggesting such an agreement exists. And plaintiffs' barebones allegations are completely implausible: why would Shell and PMI undertake

---

[7] *Cf. Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (plaintiff must present evidence that defendants engaged in concerted action, defined as having "a conscious commitment to a common scheme designed to achieve an unlawful objective"); *Theatre Enters., Inc. v. Paramount Film Dist. Corp.*, 346 U.S. 537, 540 (1954) ("crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express").

a multi-million dollar transaction, spend additional millions to de-integrate the refinery from the Deer Park chemical plant, and subject their deal to extensive federal agency review, when they could simply direct the existing Deer Park Refining Limited Partnership to export more gasoline to Mexico today? As a result, their "market allocation" claim must fail, even assuming they had pleaded it.[8]

### 2.    Plaintiffs cannot show that they will suffer any immediate or irreparable injury absent injunctive relief.

A plaintiff seeking injunctive relief must prove that it will face a substantial threat of both immediate and irreparable injury if an injunction is not issued. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); 15 U.S.C. § 26 (applicant must show "that the danger of irreparable loss or damage is immediate"); *see also In re Microsoft Corp.*, 333 F.3d 517, 528 (4th Cir. 2003) ("[T]he required irreparable harm must be neither remote nor speculative, but actual and imminent."). This element is the "most essential to a preliminary injunction." *Lewis v. S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976).

"Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Additionally, an injunction "will not be issued simply to prevent the possibility of some remote future injury. *A presently existing actual threat must be shown*." *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) (citation omitted)

Here, plaintiffs have not alleged facts or adduced any evidence to show they will suffer irreparable or immediate harm from Shell's sale of its interest to PMI.

---

[8] Such a claim would also need to be brought under Section 1 of the Sherman Act, as to which plaintiffs have neither brought nor established a cause of action.

Plaintiffs first try to escape their burden of providing evidence of irreparable harm by asserting that the Court should issue a TRO to preserve the status quo. Doc. 2 ¶ 8 n.1, ¶ 51; Doc. 15 at 18, 23. But as the Fifth Circuit has recognized, the "status quo" also includes the extensive planning and de-integration processes in which defendants have engaged to prepare for the forthcoming closing, and merely repeating the "status quo" mantra, untethered to the actual facts, will not relieve plaintiffs of the burden of proving irreparable harm:

> [The plaintiff] argues that the injunction was necessary "to maintain the status quo". This misconceives the central purpose of a preliminary injunction, which is to prevent irreparable harm. It is the threat of harm that cannot be undone which authorizes exercise of this equitable power to enjoin before the merits are fully determined. Maintenance of the status quo is only a sometimes concomitant of preventing irreparable harm—never the touchstone for such injunctive relief. Indeed, the concept itself is an elusive one at best. What the status quo is to the plaintiff—a job opening—is the antithesis of status quo to the defendant; whose normal administrative procedures have been interdicted.

*Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975) (internal citations omitted) (reversing district court's refusal to dissolve injunction).

Next, plaintiffs claim irreparable harm because the transaction will allegedly have the effect of "raising gasoline prices and energy prices for consumers and businesses like Plaintiff and his businesses." Doc. 2 ¶ 18; *accord* Doc. 15 at 16–18. That claim depends solely on speculation that the sale will somehow decrease the supply of gasoline in the United States, and that will raise gasoline prices the individual plaintiffs pay and that customers of the laundromat pay, which may increase plaintiffs' cost of living and decrease the laundromat's profits. *Id.* ¶¶ 26, 29–31.[2] This

---

[2] Other than cases involving individuals on low or fixed incomes who face loss of benefits or lack of access, etc., plaintiffs do not cite and defendants are unaware of any case holding that a general increase in the cost of living, like plaintiffs allege here, constitutes irreparable harm. *E.g.*, *R.S. v. Bd. of Educ. Shenendehowa Cent. Sch. Dist.*, No. 1:17-CV-501 (LEK/CFH), 2017 WL 3382159, at *2 (N.D.N.Y. Aug. 7, 2017) ("Plaintiffs' claim that they will suffer lost income and higher costs of living if they relocate to Newton does not constitute irreparable harm and cannot support the issuance of a preliminary injunction.")

theory makes no economic sense. Ex. G, Shehadeh Dec. ¶¶ 33-36. Plaintiffs' somehow, someday fears, unsupported by facts to corroborate their inferences, cannot support their requested relief. "'[A]llegations of *possible* future injury' are not sufficient" to establish an injury in fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

Similarly, plaintiffs contend they will lose customers and business goodwill from their coin-operated laundromat "as gasoline prices increase and raise energy costs." But "[s]imply arguing that a company is losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm." *Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 620 (W.D. La. 2010); *see also DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) ("The lost goodwill of a business operated over a short period of time is usually compensable in money damages.").

And as discussed in defendants' motion to dismiss, plaintiffs have not alleged how gasoline from a Texas refinery makes it to the New York plaintiffs (particularly given that the New York Harbor trading hub is only about 50 miles from plaintiffs' community in Mt. Vernon). Plaintiffs do not consider any of the relevant factors used to define markets. Ex. G, Shehadeh Dec. ¶¶ 38-44. The gasoline blend stock produced at refineries like Deer Park is a commodity traded and transported within and between regions of the United Sates, as well as internationally. Beyond stating that the Deer Park refinery "sometimes produces about 2.5% of the daily refined gasoline in the United States," Doc. 2 ¶ 44, plaintiffs make no allegations about the dynamics of the largest gasoline market in the world that would create a "fairly traceable connection" between the Deer Park transaction and the retail gasoline that plaintiffs and their customers buy.

Plaintiffs' many assertions of injuries that are not supported by evidence (or basic economics) fail to establish irreparable harm. *Holland*, 777 F.2d at 997; *American Telnet, Inc. v.*

*GTE Corp.*, No. CIV.A.3:99CV0280D, 1999 WL 242686, *3 (N.D. Tex. Apr. 16, 1999) (denying preliminary injunction where, among other deficiencies, "[n]owhere in plaintiffs' irreparable harm analysis do they adduce evidence of a substantial threat of irreparable injury"). At bottom, when seeking injunctive relief, a plaintiff's "total failure of proof as to why money damages are not measureable or adequate cannot be excused." *Hardin v. Hous. Chron. Publ'g Co.*, 426 F. Supp. 1114, 1118 (S.D. Tex. 1977). Plaintiffs offer nothing other than their say-so that they will be irreparably harmed if PMI purchases the remaining interest in the joint venture. That cannot support the injunctive relief they request.

The three plaintiffs here cannot escape their burden of proving that damages are not measureable or adequate by arguing that they did not plead for damages or that their status as indirect purchasers bars a damage claim under the federal antitrust laws. A finding of irreparable harm must be based on the harm allegedly caused by the conduct at issue, not by the pleading choices of the individual plaintiffs. *See Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) ("[A]n 'injury is "irreparable" only if it cannot be undone through monetary remedies.'") (alteration in original) (citation omitted).

Plaintiffs, who are New York residents, also do not have irreparable injury because indirect purchasers could recover money damages under state antitrust law: New York's Donnelly Act. *See, e.g.*, Donnelly Act, N.Y. GEN. BUS. LAW § 340(6); *see also, e.g.*, *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 726–27 (S.D.N.Y. 2017) (holding that where indirect purchasers participate in a market and are close in the chain of causation, they may assert injury and damages under the Donnelly Act); *Nirvana, Inc. v. Nestle Waters N. Am., Inc.*, 123 F. Supp. 3d 357, 378–79 (N.D.N.Y. 2015). Moreover, plaintiffs' complaints about the effects of high gasoline and energy prices are the paradigm for possible damage remedies in antitrust cases

for those injured by an antitrust violation. "There can be no irreparable injury where money damages would adequately compensate a plaintiff." *DFW Metro Line Servs.*, 901 F.2d at 1269; *accord Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975); *see also American Telnet*, 1999 WL 242686, at *3 (plaintiffs' contentions that "they will lose goodwill, suffer damage to their reputation, inevitably lose customers, and almost certainly be forced out of business in the relevant markets . . . failed to establish a substantial threat of irreparable injury"). Thus, if these plaintiffs participate in the relevant market (as they assert they do here), they cannot prove irreparable harm simply by choosing *not* to sue for damages under other statutes, like the New York Donnelly Act, that would otherwise be available to them (if they could prove actual injury and resulting damages).[10]

3.   **The harm an injunction would cause to defendants outweighs the speculative harm an injunction might somehow prevent.**

Unlike plaintiffs' speculation about potential harm they claim an injunction might prevent, the harms to defendants in holding up a $600 million transaction involving an operating asset are real and substantial.

For example, Shell's Kristen Bergeron explains in her declaration that the Deer Park refinery has historically been highly integrated with the adjacent Shell Deer Park Chemical Plant, which is and will remain 100% owned by Shell. Ex. B, Bergeron Dec. ¶¶ 2, 4. Consequently, Shell has

---

[10] Another factor counselling against a finding that plaintiffs face irreparable harm is that Shell and PMI announced the sale of Shell's interest in the Deer Park Refinery on May 24, 2021. News outlets covering the deal at the time stated the parties intended to close the sale in the "fourth quarter of 2021." The FTC finished its review on July 23, 2021, following a 30-day waiting period—nearly five months before Plaintiffs sought relief. Ex. F, Dierking Dec. ¶¶ 8, 9. The speculative harm plaintiffs allege could be considered "immediate" only because this suit was filed on the eve of closing. *See e.g.*, *Anyadike v. Vernon College*, No. 7:15-CV-00157-O, 2016 WL 107901, at *10 (N.D. Tex. Jan. 11. 2016) (a six-month delay in filing "militates against issuance of a preliminary injunction"); *Expedi, Inc. v. Rebound Int'l, LLC.*, No. 4:20-CV-3897, 2021 WL 3702169, at *3 (S.D. Tex. May 13, 2021) (nine-month delay proves no apparent urgency).

undertaken, and is near completion of, a massive, eight-month project to separate the operations of the two facilities in anticipation of the imminent closing. *Id.* ¶¶ 7-11.

As detailed in Ms. Bergeron's declaration, Shell has a $30 million total budget for the de-integration activities, which are now approximately 90% complete. These activities include:

- Separating shared control rooms to create separate control rooms for the two facilities;

- Separating the process control networks and systems, including monitoring equipment, safety equipment, and systems for operating the various units at two facilities;

- Hiring 35 contractors to create separate finance, human resources, and other "back-office" functions for each facility;

- Creating a dual information technology environment, which will enable certain IT functions to be transferred to PMI at closing, which included purchasing temporary licenses from vendors like Microsoft;

- Creating new email addresses for refinery employees who will be employed by PMI following the acquisition;

- Taking inventory readings on tanks that are currently shared, but which will be allocated between the two facilities at closing;

- Allocating the shared fleet of 600 vehicles between the two facilities; and

- Informing the Environmental Protection Agency, Texas Commission on Environmental Quality, and other regulators of upcoming permit transfers.

*Id.* ¶ 8. And Ms. Bergeron also explains that should closing be delayed further, Shell will have to spend additional money to maintain systems that will be in limbo and will likely also have to repeat work that has already been done in anticipation of closing. *Id.* ¶ 9.

Delaying the transaction also presents significant risks to PMI. PMI has also invested significant resources related to the acquisition, spending more than $3 million to external service providers for services related to the acquisition. Ex. C, Flores Camacho Dec. ¶ 5. PMI has also negotiated a $500 million bridge loan to partially fund the acquisition and provide the refinery with working capital following the transaction – if the transaction is delayed PMI may have to prepay the outstanding disbursements or pay additional fees and charges to keep the funds

available while waiting for the closing to occur. *Id.* ¶ 7. As part of the transaction, PMI is also responsible for preparing or assuming Deer Park Refining Limited Partnership's debt, and providing Shell with evidence that the debt will be paid in full at closing. *Id.* ¶ 8. That process requires that PMI provided notices to the refinery's bondholders and lenders so that pay off amounts can be calculated. *Id.* ¶ 8. If that process is delayed by an injunction, there is no guarantee that those third parties might be willing to agree to a prepayment strategy in the future. *Id.*

Another significant issue relates to the unionized workforce at the refinery and chemical plant. Shell's current collective bargaining agreement with the United Steel Workers (USW), representing hourly employees, expires on January 31, 2022. This agreement applies to both the Deer Park Refinery and Deer Park Chemicals Plant workers. Ex. B, Bergeron Dec. ¶ 10. Closing the transaction as soon as possible will allow time for Shell to bargain a union contract for the Deer Park Chemicals Plant workers and PMI to bargain for the Deer Park Refinery workers as the successor employer after closing. *Id.* ¶ 11. Any delay in closing likely will complicate bargaining for all parties involved and may impact operations and employee morale if new contracts are not in place before the current USW contract expires on January 31, 2022. *Id.*; *see also* Ex. C, Flores Camacho Dec. ¶ 9.

Finally, there is the impact to the workers themselves. Hundreds of people who were set to become PMI employees would be left in limbo. Payroll and benefit-plan cut-overs would be suspended, with impacts both to the employees and to Shell, which expected that hundreds of workers would be migrating to PMI's payroll in early 2022. Beyond the hourly workforce, the lives and careers of Shell's managerial staff would be disrupted if they have to remain at the refinery rather than moving on to other jobs elsewhere within Shell as planned.

**4.      Plaintiffs fail to show that the proposed injunction will not disserve the public interest.**

Plaintiffs seek an injunction preventing the consummation of the proposed transaction or ordering PMI to divest its interest if the transaction closes. Plaintiffs ignore that two U.S. government agencies charged with reviewing this transaction in the public interest (the FTC and CFIUS) have taken no action to stop this transaction. And aside from their speculation about potential competitive effects of the transaction, plaintiffs ignore that they have the burden of establishing that their requested injunction would not disserve the public interest.

Here the public interest would be disserved in many ways were the transaction to be enjoined. First, the implicit relief that plaintiffs seek is stopping exports of gasoline to Mexico (even though nothing currently prohibits any of the defendants—or anyone else—from exporting gasoline to Mexico today).[11] The relief plaintiffs request would be against the public policy and the treaty obligations of the United States, as embodied in United States-Mexico-Canada Agreement (USMCA), the purpose of which is to, among other things, "preserve and expand regional trade and production." The United States-Mexico-Canada Agreement, U.S.-Mex.-Can., Preamble A.0, agreed to Oct. 1, 2018, *available at* https://ustr.gov/trade-agreements/free-trade-agreements/united-states-mexico-canada-agreement/agreement-between.

That this sale is to PMI—an affiliate of Mexico's national oil company—further shows that enjoining the transaction would disserve the public interest. Federal courts have long been reluctant to interfere in matters that could adversely affect foreign relations. *See, e.g.*, *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) ("In general, matters relating to the conduct of foreign relations are so exclusively entrusted to the political branches of

---

[11] Indeed, plaintiffs complain the "deal will tend to create a monopoly for PEMEX in Mexico" and they refer to "PEMEX's march toward monopoly in Mexico." Doc. 15 at 15. But even if true, that, of course, would be an issue for the Mexican antitrust authorities, not the U.S. courts, and represents alleged conduct outside the United States gasoline market plaintiffs allege here.

governments as to be largely immune from judicial inquiry or deference.") (internal quotation marks, citations, and alterations removed). In *Spectrum Stores*, the Fifth Circuit affirmed a district court's judgment dismissing claims against OPEC member nations and private companies under the antitrust laws. The court recognized that the merits of the case "would require a court to recast what are foreign policy and national security questions of great import in antitrust law terms." *Id.* at 952. There the plaintiffs sought "nothing short of the dismantling of OPEC and the inception of a global market that operates in the absence of agreements between sovereigns as to the supply of a key natural resource." *Id.* But the court found that was a task to which "[t]he Sherman and Clayton Acts are decidedly inadequate." *Id.* The Fifth Circuit therefore held that the case presented a non-justiciable political question.

The executive branch of the United States has had a chance to weigh in on this transaction and it has decided not to do so; the public interest, therefore, would not be served by this Court's substituting its judgment for that of the executive branch.[12]

**5.    Plaintiffs' defective verifications preclude relief under Rule 65.**

As earlier explained, plaintiffs have offered nothing but conclusory and speculative statements in both their complaint and their application for injunctive relief. But not one "fact" in either pleading is sworn on personal knowledge of facts that might support their request for extraordinary relief. Plaintiffs' so-called verifications do not meet the requirements of Rule 65, and that represents yet another reason their request for injunctive relief should be denied.

Rule 65 authorizes courts to issue a TRO only if plaintiffs allege "specific facts" showing "immediate and irreparable" harm will occur. FED. R. CIV. P. 65(b)(1)(A). Plaintiffs may make

---

[12] The exhibits plaintiffs filed with their complaint—five letters between various U.S. politicians and various governmental officials variously discussing relations between Mexico and the United States, competition in the oil and gas sector, and the transaction, Docs. 2-1–2-5, along with a newspaper article discussing the transaction—underscore that point.

that showing in a sworn statement under oath or by a verification signed "under penalty of perjury" that the statements in the pleading are "true and correct." *See* 28 U.S.C. § 1746.

And because a TRO or preliminary injunction is an "extraordinary remedy," the Federal Rules demand greater reliability than is typically required for pleadings. *See Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009). Rule 65 requires either "an affidavit or a verified complaint" so that specific facts based on personal knowledge can provide proof for imminent, irreparable harm where conclusory statements premised solely on speculative belief cannot. FED. R. CIV. P. 65(b)(1)(A); *see Gebhart Eur. Autos, LLC v. Porsche Cars of N. Am., Inc.*, No. 10–CV–02696–MSK, 2010 WL 4642490, at *1 (D. Colo. Nov. 9, 2010) (holding statements lacking personal knowledge were "unverified").

In the purportedly "verified" complaint, Mr. Hagele and Mr. Sarcinella each state only that "to the best of [his] knowledge, information and belief, the allegations in [the complaint] are true and correct." Doc. 2 at 10, 11. But the complaint lacks the "key requirement" of Rule 65(b): specific facts. *Stone Metals Am., LLC v. Eubank*, No. 3:20-CV-0253-K, 2020 WL 570906, at *2 (N.D. Tex. Feb. 5, 2020). Plaintiffs' supposed "verification" of unsupported conclusions does not transform those speculative allegations into the "specific facts" required for a TRO. *See Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971) ("[D]istrict courts have shown appropriate reluctance to issue preliminary injunction orders where the moving party supports his side of a factual dispute on information and belief.").

6. **Plaintiffs' failure to indicate their willingness or capability to post security for costs due to any injunctive relief compels denial.**

Rule 65 requires that a plaintiff who can establish each requirement for injunctive relief must also post security before a court issues an injunction. And despite the plain language of Rule 65(c) that "the court may issue a preliminary injunction or a temporary restraining order *only* if

the movant gives security," FED. R. CIV. P. 65(c) (emphasis added), and of Clayton Act Section 16, which likewise requires a "proper bond against damages for an injunction improvidently granted," 15 U.S.C. § 26, plaintiffs argue that they should not have to post *any* security.

The Fifth Circuit has been clear on both the purpose and importance of the bond requirement to protect all parties in the litigation. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 379 (5th Cir. 2008). Plaintiffs try to evade that requirement by contending that under *City of Atlanta v. Metropolitan Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. Unit B Feb. 1981), their private antitrust case falls within a public-interest exception to Rule 65's security requirement. Doc. 15 at 22. They say *City of Atlanta* supports their proposition. But *City of Atlanta* was "filed on behalf of local government entities, a union for domestic workers, a welfare rights organization, and a pauper representing herself and others similarly situated." The Fifth Circuit therefore found that "[i]n a real sense, plaintiffs were engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement." *City of Atlanta*, 636 F.2d at 1086.

Plaintiffs here are not suing on behalf of a government entity, a union, a welfare rights organization, a pauper, or any type of public-interest group. They are suing on behalf of themselves and their business. Their goal is protect their financial interests—their personal costs of living and their business profits. And even in *City of Atlanta*, which did not require a TRO bond for plaintiffs litigating in the public interest, the trial court made clear that "if a preliminary injunction were granted, security *would* be required." *Id.* (emphasis added). Plaintiffs have shown no reason to deviate from Rule 65's bond requirement.[13]

---

[13] The other cases plaintiffs cite similarly do not support their attempt to avoid Rule 65's bond requirement. *See* Doc. 15 at 22. Instead, those cases make clear that a court should waive the bond requirement only in rare circumstances—e.g., if the injunction will not cause the nonmovant any

In this case, as Ms. Bergeron Mr. Flores Camacho explain in their declarations, the potential costs to the parties if a delay occurs, and a bond to cover the value of the transaction—$600 million—would be appropriate. The risk of harm to plaintiffs or their coin-operated laundry business from the transaction's closing is speculative, but the risk of irreparable harm to Shell and PMI in potentially having to re-integrate the activities they have almost completed de-integrating, or potentially losing financing or increasing the cost of the transaction, were an injunction improvidently granted is real and dwarfs any potential risk allegedly facing plaintiffs. Doc. 2 ¶ 28.

## CONCLUSION

For these reasons, defendants Shell Oil Company, PMI Services North American Inc., and Deer Park Refining Limited Partnership ask that the Court deny plaintiffs' application for a TRO or preliminary injunction and grant defendants all relief to which they may be entitled.

---

financial harm or if the requested waiver is unchallenged. *E.g.*, *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016) (no bond required because court found the defendants wouldn't "suffer any financial loss"); *Glycobiosciences, Inc. v. Woodfield Pharm., LLC*, No. 4:15-CV-02109, 2016 WL 1702674, at *9 (S.D. Tex. Apr. 27, 2016) (no bond required where injunction did not create risk of loss for the defendant, the parties had contractually waived a bond requirement, and the defendant did not oppose request to waive the bond). None of those exceptional circumstances apply here.

Dated: January 4, 2022.

Respectfully submitted,

OF COUNSEL:

/s/ Layne E. Kruse

Layne E. Kruse

NORTON ROSE FULBRIGHT US LLP

State Bar No. 11742550

Carlos R. Rainer

Federal ID No. 2383

State Bar No. 24027641

layne.kruse@nortonrosefulbright.com

carlos.rainer@nortonrosefulbright.com

1301 McKinney, Suite 5100

Anne M. Rodgers

Houston, TX 77010-3095

State Bar No. 17133025

Telephone: (713) 651-5151

anne.rodgers@nortonrosefulbright.com

Facsimile: (713) 651-5246

Eliot Turner

State Bar No. 24066224

eliot.turner@nortonrosefulbright.com

*Attorney-in-Charge for Defendants Shell Oil*

Luke Schamel

*Company and Deer Park Refining Limited*

State Bar No. 24106403

*Partnership*

luke.schamel@nortonrosefulbright.com

/s/ Michael T. Murphy

Michael T. Murphy

State Bar No. 24051098

Federal ID No. 621098

mtmurphy@winston.com

OF COUNSEL:

800 Capitol St., Suite 2400

Houston, TX 77002

WINSTON & STRAWN LLP

Telephone: (713) 651-2600

Aldo A. Badini*

Facsimile: (713) 651-2700

abadini@winston.com

Marcelo M. Blackburn*

mblackburn@winston.com

*Attorney-in-Charge for Defendant PMI*

Winston & Strawn LLP

*Service North America, Inc.*

200 Park Avenue

New York, NY 10166-4193

Telephone: (212) 294-6700

*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2022, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

*/s/ Layne E. Kruse*
Layne E. Kruse

*Counsel for Defendants Shell Oil Company and Deer Park Refining Limited Partnership*